Filed 11/24/25  P. v. Holguin CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>FELIPE ROMAN HOLGUIN,<br><br>     Defendant and Appellant. | F087007<br><br>(Super. Ct. No. MCR052047)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans, and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant and defendant Felipe Roman Holguin (defendant) was charged with committing the first degree murder of Demitrius Padilla (Pen. Code, §187, subd. (a))[1] with a special circumstance and firearm enhancements. The charged offenses and allegations carried the maximum possible sentence of life in prison without the possibility of parole (LWOP) for first degree murder with the special circumstance, plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement.

At the preliminary hearing, an eyewitness testified and identified defendant as the person who fired multiple guns shots at Padilla. Another witness testified that on the same night as the murder, defendant asked him to get rid of bullet casings and made incriminating statements on later occasions. Both witnesses testified under grants of immunity.

In 2016, both witnesses repeated their testimony at defendant's jury trial; the eyewitness again identified defendant as the gunman, and the second witness testified about defendant's incriminating conduct and statements. On the fourth day of the trial, the eyewitness who identified defendant as the gunman was on the stand and had not been cross-examined yet, and the prosecution was still presenting the case-in-chief. On that day, however, defendant entered into a negotiated disposition and pleaded guilty to first degree murder for a sentence of 25 years to life and agreed to waive his appellate rights, in exchange for the dismissal of the special circumstance and the firearm enhancements, thus avoiding both the LWOP sentence and a maximum additional term of 25 years to life. The parties stipulated to the preliminary hearing and the partial trial transcripts as the factual basis for the plea, along with the prosecutor's statement that defendant shot and killed the victim.

---

[1]    All further statutory citations are to the Penal Code unless otherwise stated.

2.

Shortly after entering his guilty plea, defendant filed a motion to withdraw his plea. The trial court conducted a hearing, denied the motion, and sentenced defendant to 25 years to life for first degree murder consistent with the negotiated disposition. Defendant filed an appeal limited to his motion to withdraw his plea. This court found the motion was properly denied and affirmed the judgment.

In 2022, defendant filed a motion for resentencing of his murder conviction pursuant to section 1172.6, using a preprinted form and checking boxes to assert he was charged and convicted under one of the now-invalid murder theories of imputed malice. The People filed opposition, attached the plea transcript, and argued the petition failed to state a prima facie case for relief because defendant stipulated to the factual basis when he entered his plea, that he shot and killed the victim. Defendant's appointed counsel filed a reply and argued the trial court could not rely on this court's nonpublished opinion in the direct appeal or the preliminary hearing transcript to make the prima facie determination, his petition stated a prima facie case since he pleaded guilty, and an evidentiary hearing should be held.

In 2023, the trial court denied defendant's petition for failing to state a prima facie case. In doing so, the court did not rely on any aspect of defense counsel's factual basis stipulation at the plea hearing, and instead, reviewed the transcripts from the preliminary hearing and partial trial, and held the record of conviction showed he was the actual killer and ineligible for relief.

In this appeal from the trial court's denial of defendant's section 1172.6 petition, the parties' initial briefing addressed whether the court relied on the parties' factual basis stipulation at the plea hearing to find he was the actual killer, the court relied on the preliminary hearing and partial trial transcripts to make the prima facie determination, or if the court erroneously relied on those transcripts to make factual findings to deny the petition and should have conducted an evidentiary hearing.

At the time of the trial court's hearing and the parties' initial appellate briefing, appellate courts were divided on whether a preliminary hearing transcript was part of the record of conviction and could be relied on to make the prima facie determination, and the issue was pending before the California Supreme Court.

While this appeal was pending, the California Supreme Court decided *People v. Patton* (2025) 17 Cal.5th 549 (*Patton*), and held that in making the prima facie determination as to whether a petitioner, who entered a plea instead of going to trial, was convicted under a now-invalid imputed malice theory of homicide in a section 1172.6 petition, the trial court may "rely on unchallenged, relief-foreclosing facts within a preliminary hearing transcript to refute conclusory, checkbox allegations" made in a form section 1172.6 petition. (*Patton*, at p. 564.) *Patton* disapproved of appellate decisions that "conditioned the use of preliminary hearing transcripts [to make the prima facie determination] on whether a petitioner previously admitted the truth of testimony contained therein or stipulated to the transcript as the factual basis of a plea." (*Id.* at p. 569, fn. 12.) *Patton* affirmed the trial court's denial of the section 1172.6 petition in that case but granted the defendant's request to remand the matter for the opportunity to file an amended petition consistent with the Supreme Court's ruling. (*Patton*, at pp. 569–570.)

After *Patton* was decided, this court ordered the parties herein to file supplemental briefs on its impact to this case. The People assert the trial court properly considered the preliminary hearing and partial trial transcripts to find defendant's "check-box" form petition failed to state a prima facie case for relief since that evidence established defendant was the actual killer and ineligible for resentencing, and remand is not required even after *Patton.*

Defendant acknowledges the holding in *Patton* but disagrees how it applies to the preliminary hearing and partial trial evidence in this case. Defendant asserts the trial court had to make credibility findings to believe the two witnesses since they testified

4.

under grants of immunity and gave conflicting prior statements. Defendant also raises ineffective assistance arguments arising from both the plea hearing and the section 1172.6 prima facie determination. In the alternative, defendant requests remand in order to file an amended petition to plead additional facts, as permitted in *Patton*.

We find that in making the prima facie determination, the trial court properly reviewed the preliminary hearing and partial trial transcripts as part of the record of conviction, completely independent from the factual basis stipulation at the plea hearing, to find defendant was the actual killer and ineligible for resentencing under section 1172.6. Defendant's contrary claims, including his alleged "immunity" and ineffective assistance arguments, are refuted by the record. As in *Patton*, however, we grant defendant's request to remand the matter for him to have the opportunity to file a supplemental petition in the trial court.

## PROCEDURAL BACKGROUND

On July 28, 2015, a felony complaint was filed that charged defendant with count 1, first degree premeditated murder of Padilla (§ 187, subd. (a)), with the gang special circumstance (§ 190.2, subd. (a)).

It was further alleged defendant personally and intentionally discharged a firearm proximately causing great bodily injury and death (§ 12022.53, subd. (d)); he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); and he personally used a firearm (§ 12022.5, subd. (a)(1), 12022.53, subd. (b)).

On July 30, 2015, the court conducted the arraignment. Defendant refused to appear in court. The court appointed the public defender, who entered a not guilty plea.

On August 4, 2015, the public defender advised the court about a conflict. The court discharged the public defender and appointed Antonio Alvarez to represent defendant.[2] Thereafter, Mr. Alvarez represented defendant at the preliminary hearing,

---

[2]     At the time of trial, Mr. Alvarez was from the Richard Ciummo firm in Fresno.

the partial jury trial, the plea hearing, defendant's motion to withdraw his plea, and the sentencing hearing.

## PRELIMINARY HEARING EVIDENCE[3]

On October 2 and 6, 2015, the preliminary hearing was conducted. For purposes of that hearing, the parties stipulated to certain gang evidence, and that Padilla died of a gunshot injury.[4]

The prosecutor stated that Carmen Hernandez and Jose Ochoa were witnesses who possibly had Fifth Amendment issues, and they received use immunity for their preliminary hearing testimony.

### I.      Carmen Hernandez.

Carmen Hernandez testified defendant was the gunman who shot Padilla and explained how she knew defendant and Padilla.

Hernandez worked for Eddie Herrera for two years, managed his bar, and sold drugs for him. Hernandez had seen defendant at Herrera's bar, and she knew defendant and Herrera were friends and might have been relatives.

While she was working for Herrera, Hernandez and James Owens, her boyfriend, lived in a house on Avenue 17 that Herrera was renting.

Hernandez had known Padilla for six years, and Padilla and his wife were godparents to her child. Hernandez knew there had been a prior altercation between Padilla and Herrera.

---

[3]      During the pendency of this appeal, we granted defendant's unopposed request to take judicial notice of the record and nonpublished opinion in *People v. Holguin* (June 5, 2018, F073524) (*Holguin I*), that affirmed the judgment on direct appeal.

Given the ruling in *Patton*, we separately review the evidence introduced at the preliminary hearing and partial trial.

[4]      We need not review the prosecution's gang evidence since the negotiated disposition resulted in dismissal of the gang special circumstance.

In April 2015, Herrera told Hernandez and Owens that they had to move out of the Avenue 17 house immediately. After delivering this news, Hernandez and Herrera argued about when they had to get out of the house and got some time to get out. Hernandez told Padilla that they had to leave Herrera's rental house, and Padilla invited them to live at his Park Street residence.

Hernandez testified that after Herrera told them to get out of the Avenue 17 house, but before she moved out, she knew that Padilla and "another acquaintance" broke into Herrera's house and stole his drug supply. After the burglary, Hernandez met Padilla in the basement of his Park Street house, and they divided the drugs that he stole from Herrera's house. Hernandez denied that she told Padilla that Herrera kept his drug supply at his house.

Hernandez testified that when she left the Avenue 17 house, she lived in the basement of Padilla's house on Park Street with Owens. Hernandez later parked a trailer inside Padilla's backyard fence, and she lived inside the trailer with Owens. At the time of the murder, Hernandez and Owens had been living at the Park Street house for three weeks.

## A. *Defendant confronts Padilla.*

Hernandez testified that around 5:00 p.m. on May 25, 2015, Memorial Day, she walked from Padilla's house to Walgreen's with Owens, Padilla, and "Susan."[5] After they finished at Walgreen's, they crossed the street to a gas station store. A car approached them, and defendant jumped out. Defendant went up to Owens and Padilla, lifted his shirt, and said he did not have a weapon. Defendant asked Owens and Padilla whether they had robbed his friend, Herrera. Defendant said he was going back to speak to Herrera. He shook hands with Owens and Padilla and walked away.

---

**5** At the preliminary hearing, Hernandez did not identify "Susan." At trial, however, she testified Susan Flores was Padilla's girlfriend, and she walked to the store with them.

**B.**     *The murder*.

Hernandez testified that around 10:40 p.m. on May 25, 2015, she was in Padilla's backyard with Padilla, and they were talking about whether he could fix his car. Owens was inside the trailer and watching television. Padilla's backyard was surrounded by a wood fence and had a wrought iron gate for a car to enter. The backyard was illuminated by a streetlight directly outside the wrought iron gate, and there were lights on a building across the street.

Hernandez testified that as she talked with Padilla, she heard someone whistle. Both Hernandez and Padilla looked toward the gate. Hernandez testified she clearly saw defendant standing outside the gate from the lighting in the area. He was wearing the same clothes as when she encountered him earlier that day.

Hernandez testified Padilla walked toward the gate like he was going to speak to defendant. Hernandez turned toward the trailer and talked with Owens.

Hernandez testified she heard two gunshots. Hernandez again looked at the gate and saw Padilla lying on the ground. Hernandez testified defendant's right arm and hand were sticking through an opening in the gate and "his arm [was] through the gate, shooting." Owens pulled her down and she heard more gunshots. After the shots ended, Hernandez called 911 and Owens tried to help Padilla, but he was not responding.

**C.**     *Cross-examination of Hernandez*.

Hernandez testified she received immunity to testify and knew she would not be prosecuted for her involvement in Padilla's burglary of Herrera's house and theft of his drugs.

Hernandez testified she spoke to Detective Gutknecht on the night of the shooting, and said she heard gunshots, but she did not see the gunman or what happened. Hernandez made those statements because she was "concerned about James [Owens], and I was concerned about [Padilla's] kids because they walked out and seen [Padilla] laying there" in the backyard, and she wanted everyone to get inside the house.

8.

Hernandez testified that two days after the shooting, she was interviewed again by the police and did not tell them that she saw the gunman.

About one week after the shooting, Hernandez was interviewed by the police for the third time and was confronted with information about Padilla's theft of Herrera's drugs, her role in the incident, and the encounter with defendant at the gas station a few hours before the shooting. At that time, Hernandez told the detectives she saw the gunman and she was 80 percent sure that Padilla was the shooter.

## II.     James Owens.

James Owens, Hernandez's boyfriend, testified he knew Eddie Herrera because he helped Hernandez operate Herrera's bar and run drugs for him. He knew defendant from the bar. Owens ended his involvement in drug sales in 2012, after he was arrested and had health problems, but Hernandez continued to sell drugs for Herrera.

At the beginning of 2015, Owens and Hernandez were living in Herrera's rental house. At some point, Herrera told them to move out. Owens stopped communicating with Herrera and they moved to Padilla's house.

Owens testified that around 5:00 p.m. on May 25, 2015, he walked to the store and gas station with Hernandez and Padilla. When they left the store, defendant was walking toward them. They went to the gas station and when they left, defendant was standing on the street.

Owens did not want to get too close to defendant because he "looked a little bit upset." Defendant lifted his shirt and showed Owens that "he didn't have nothing on him."

Owens testified defendant started talking about Herrera and said somebody stole from him. Owens told defendant that he did not know what he was talking about. Defendant looked at Owens "with disgust," and suggested Owens call Herrera and " 'try to let him know that you had nothing to do with it.' " Owens said he did not have Herrera's new telephone number.

Owens shook hands with defendant, they hugged, and defendant said he was going to talk to Herrera. Owens again said he did not know about a theft, and they went their separate ways.

Owens testified that on the evening of May 25, 2015, they were at Padilla's house. Owens was inside the trailer watching television. Hernandez was standing outside the trailer talking with Padilla in the backyard.

Owens heard someone whistle by the fence. Owens leaned forward to look through the trailer's door and into the backyard. Padilla turned around to see who whistled and then walked toward the fence. Hernandez walked to the trailer and told Owens who whistled. Owens heard gunshots and pulled down Hernandez. He looked outside and saw a steady flash as four or five gunshots were fired in succession from the gate into the backyard.

### III.    Patricia Valencia.

Valencia testified she was Jose Ochoa's girlfriend. On May 25, 2015, they were living at a friend's house.[6] Valencia testified in the late evening, they were in the friend's backyard, and defendant arrived and talked to Ochoa.

Valencia testified she was in the house, "peeked" through a window and saw defendant hand bullet shells to Ochoa. Valencia testified she heard Ochoa "get a little loud, and he had told [defendant] that, he was yelling at him telling him he was dumb and what did he do it for." Valencia heard Ochoa say "why did [defendant] shoot him, and [defendant] said that he was done. [Defendant] answered that he was done."

On further examination, Valencia testified her mother heard the statements and told her. The court ordered the answer stricken. Valencia testified she did not tell the police that both she and her mother heard defendant say he shot somebody.

---

**6**    Ochoa and Valencia were not living at Padilla's house. At trial, Ochoa testified they were staying at the home of Valencia's mother.

## IV. Jose Ochoa.

Ochoa testified about the night that he was with his girlfriend, Patricia Valencia, at their friend's house. Ochoa and Valencia were arguing in the backyard. Sometime between 10:00 p.m. and 11:00 p.m., defendant unexpectedly arrived at this house. At that time, Ochoa did not know that anyone had been shot.

Ochoa testified defendant said he wanted to get high, but they did not use drugs that night. Defendant was "amped up" and appeared under the influence. Ochoa had dropped out of a gang. Defendant told Ochoa about the person currently running the gang, and said there was a chance for Ochoa to get back in.

Ochoa testified defendant reached into his pocket and produced five or six loose shell casings, that he believed were from .38-caliber bullets. Defendant said something had transpired and told Ochoa to get rid of them. Ochoa testified defendant tried to give the shell casings to him, and Ochoa refused to take them. Defendant put the casings back in his pocket, said he would get rid of them, and left the area.

Ochoa testified that after he learned of Padilla's death, he had subsequent conversations with defendant. Ochoa testified defendant never said he killed Padilla, but he was "insinuating that he knew how [Padilla] had died," and said Padilla "[g]ot shot." Defendant "had a lot of worries. It was out that supposedly he was being, he was a person of interest in some type of case .…" Defendant was "just worrying about something he had did and the only way, [the] only great offense that somebody had to worry about was pretty much the murder" of Padilla.

Ochoa testified about another conversation with defendant in Ochoa's garage, when they both used methamphetamine. Defendant said that on the day of the murder, he saw Padilla, also known as "Game Over," and "got into it at the gas station." Ochoa testified defendant said "something about [Padilla] being lured into an alley or something like that," and defendant also said, " 'I let that fool have it.' " Defendant said he regretted it, he "felt bad about it," and "he shouldn't have shot him." Defendant said he

11.

did it for the gang and to be good with the gang. Based on this conversation, Ochoa believed defendant admitted defendant shot Padilla.

On cross-examination, Ochoa testified he had prior convictions and served prison time. He was currently in custody for other charges and testifying under a grant of immunity. Ochoa did not disclose information about defendant until he was arrested in an unrelated case. Ochoa was paid by the Madera Police Department to disclose what he knew about Padilla's death and find out where defendant was. On redirect examination, Ochoa testified he was told that defendant had an altercation with Padilla at a gas station on the day of the murder.

## V. Law Enforcement Testimony.

Officer Aguilera testified he conducted a recorded interview with Patricia Valencia on May 28, 2015, after she was arrested for an unrelated matter. Valencia said she was staying at a friend's house with Ochoa. Late one night, they were arguing in the backyard when defendant arrived, and Ochoa told Valencia to go inside. Valencia said she went inside, but stood behind a door and could still see and hear what happened. Valencia said defendant told Ochoa that "he had shot someone, and he had some—he had about four casings that [defendant] wanted [Ochoa] to get rid of." Valencia said defendant gave Ochoa the casings, but Ochoa gave them back to defendant.

After the preliminary hearing was conducted, the court held defendant to answer on the murder charge, the gang special circumstance, and the firearm enhancements.

### DEFENDANT'S JURY TRIAL

On October 16, 2015, the information was filed that charged defendant with count 1, first degree premeditated murder of Padilla, with the gang special circumstance and the same firearm enhancements. Defendant faced a maximum possible sentence of LWOP for murder with the special circumstance, plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement. Defendant pleaded not guilty.

12.

In January 2016, defendant's trial began before Judge Blea, who conducted several days of motions, evidentiary hearings, and jury selection.

The People filed a pretrial motion that requested jury instructions on first and second degree murder, the special circumstance, and the firearm enhancements. The People did not request instructions on the felony-murder rule, aiding and abetting, accomplices, the natural and probable consequences doctrine, or any other felony other than murder.

In their opening statements, the prosecutor stated the evidence would show defendant shot and killed Padilla, while defense counsel asserted the evidence would show Hernandez and Ochoa were not credible and they falsely implicated defendant as the gunman.

On February 16, 17, and 18, 2016, the People introduced evidence in its case in chief.

## I.    The Prosecution's Evidence.

Padilla's wife and two stepchildren testified for the prosecution as follows. Padilla was shot in the backyard of his house on Park Street. At the time of the shooting, Padilla and his wife were still married, but Padilla was not living with his family on Park Street, and he maintained a separate residence.[7] Padilla regularly visited his family at the Park Street house and sometimes stayed overnight.

Padilla's stepson testified Hernandez and Owens were Padilla's friends, and Padilla used to hang out with them in the backyard, but they were not friends with Padilla's wife. Padilla's stepdaughter testified that her brother and Padilla did not allow her to go into the backyard. Padilla's wife testified she did not want Hernandez and Owens in her house.

---

**7**    Carmen Hernandez testified at trial that Susan Flores was Padilla's girlfriend.

13.

On the night of May 25, 2015, Padilla arrived at the Park Street house to check on the family and bring dinner. Around 9:40 p.m., Padilla's wife left for work on the nightshift at Walmart. Padilla got something to drink, said he was going to fix a car on the property, and went into the backyard. Hernandez and Owens were also in the backyard.

At the time of the shooting, Padilla's two stepchildren were the only people in the house, and they were in the living room. The stepdaughter testified she heard five or six gunshots, the shots were loud, the sounds came from the backyard, and she thought the shots were fired "a few feet away" from her location in the house.

"[A] few minutes" after the final gunshot was fired, the stepdaughter heard a car "screech" like it was going fast and "in a hurry to leave." On cross-examination, she testified that she heard the car "screech" about "30 seconds" after the final gunshot. The stepson thought he heard six shots, and he did not hear a car driving away.

The siblings immediately got down to the floor and waited for Padilla to return inside the house. The stepson eventually went outside because he felt something was wrong. The police were already there, and the stepson saw Padilla lying on the ground with gunshot wounds to his head and neck. The stepdaughter testified Hernandez entered the house and looked shocked and scared. Hernandez called Padilla's wife at work and told her what happened.

A neighbor testified she heard five to six gunshots fired and did not hear a car driving away.

Padilla was shot in the head and leg, taken to the hospital, and died on May 31, 2015. The fatal shot went through his brain. The police did not find any shell casings at the scene.

### A. *Jose Ochoa's trial testimony.*

Jose Ochoa testified he had dropped out of a gang after giving information to police about another case. He provided information to the police in this case about

14.

Padilla's death after he was taken into custody on another matter, and he received an immunity agreement. He was placed in a witness protection program, but he left the placement, took property, and was later found in a stolen vehicle.

Ochoa testified that on the night of May 25, 2015, Ochoa and his girlfriend, Patricia, were staying at the residence of the girlfriend's mother. Ochoa and Patricia were arguing in the backyard when defendant arrived. Ochoa believed Patricia went into a room at the back of house when defendant arrived.[8]

Ochoa testified defendant was a little drunk, told Ochoa who was in charge of his former gang, and said it would be easy for him to get back in the gang.

Ochoa testified defendant opened his hand and showed him four or five shell casings. Ochoa believed the shells were from .38-caliber special bullets. Defendant asked Ochoa to get rid of the shell casings for him. Ochoa pushed away defendant's hand because he did not want to get involved with the gang again. Defendant said it was okay, he would " 'do it myself,' " and left with the shell casings.

About two weeks later, defendant again arrived at the residence where Ochoa was staying. Ochoa and defendant used methamphetamine, and Ochoa asked if he had anything to do with Padilla's death. Defendant never admitted it, but Ochoa testified that defendant "insinuated" that he was involved because Padilla was also a gang drop-out. Defendant said he had a "run in" with Padilla at a store earlier on the day of the murder, told Ochoa about the incident with Padilla at the gas station, and defendant said he "let that fool have it."

Ochoa admitted that when the police asked him to get information about the case, he was told that Padilla was lured into an alley and shot.

---

[8]     Patricia Valencia was on the prosecution's witness list but did not testify before defendant pleaded guilty.

15.

**B.**     *Carmen Hernandez's trial testimony.*

On February 23, 2016, the prosecution began the fourth day of trial by calling Carmen Hernandez, who testified she received an immunity agreement to testify.

As she did at the preliminary hearing, Hernandez testified she met Eddie Herrera through her boyfriend, James Owens. She ran Herrera's bar and sold drugs for him. Hernandez was familiar with defendant because she saw him around the bar, and knew defendant and Herrera were friends and possibly relatives.

As of July 2012, Hernandez and Owens lived in Herrera's rental house on Avenue 17 as compensation for her work. Hernandez testified Padilla was her best friend and the godparent to her child. When she was living in Herrera's rental house, she became aware that Padilla had an altercation with Herrera. At the time of that altercation, Padilla told Hernandez that he wanted to rob Herrera by stealing his drugs, but Hernandez said no.

At the end of April 2015, Herrera told Hernandez and Owens that they had to immediately move out of the rental house. They did not immediately move out because it took them awhile to move their possessions. Hernandez told Padilla that they had to find somewhere to live, and Padilla invited them to live at his house.

While Hernandez was still living at the Avenue 17 house, but after Herrera said they had to move out, Padilla told Hernandez he was going to steal Herrera's drugs from his house. Hernandez initially said no, but then she said she didn't care and told Padilla the location of Herrera's drug stash.

Hernandez testified she was not present during the burglary, but she knew Padilla broke into Herrera's house on B Street and stole drugs and trading cards. After the burglary, Padilla called Hernandez and told her to meet him in the basement of the Park Street house. Hernandez testified that John Salcedo was walking out of the backyard when she arrived. Hernandez went to the basement and met Padilla, his girlfriend Susan Flores, and Cesar Cruz. Padilla had stolen drugs, trading cards, and a small amount of

16.

cash from Herrera's house. Padilla divided the stolen property with Hernandez and Cruz. Hernandez only took the drugs and was not interesting in the trading cards.[9]

Hernandez and Owens moved into Padilla's basement about a week and one-half after Herrera told her to get out of the Avenue 17 house. Hernandez and Owens later moved into a trailer that she parked in Padilla's backyard.

Hernandez testified that sometime between 5:00 p.m. and 6:00 p.m. on May 25, 2015, Memorial Day, she left the Park Street house with Owens, Padilla, and Susan Flores. They walked to a nearby Walgreen's store and then a gas station store. When they left the gas station, defendant appeared on the street and stopped them. Defendant lifted his shirt, and said he did not have any weapons and he was just there to talk. Defendant asked Owens "why was Eddie [Herrera] saying that James [Owens] robbed him, and that it … could only have been James because James knew where everything was." Owens said he did not know what defendant was talking about. Defendant said he would talk to Herrera and get back, hugged Owens, and left.

Hernandez testified she returned to the Park Street house around 9:45 p.m., and she saw Padilla's wife leave for work. Hernandez went into the backyard, entered the trailer, and talked with Owens. Padilla went to the basement and then the backyard.

Hernandez testified she walked over to Padilla, and they stood in the backyard and talked about a car that Padilla was trying to repair. Hernandez was facing the gate, and Padilla was looking toward the trailer.

Hernandez testified she heard someone whistle. Padilla turned toward the gate, whistled back, and walked toward the gate. Hernandez heard the gate chain rattle. She

---

[9]     In their opening statements, both the prosecutor and defense counsel stated the evidence would show that Padilla committed the burglary and theft at Herrera's house with Cesar Cruz and John Salcedo. Hernandez testified that she saw Salcedo and Cruz after the burglary and theft, but the prosecution had not yet introduced evidence about whether Padilla had accomplices when defendant entered his plea, and no further evidence was introduced.

17.

looked toward the gate and saw defendant standing outside the gate. Hernandez testified the area was illuminated by both streetlights and strong lights on a nearby building. Hernandez walked toward the trailer, and Owens asked her who was at the gate. Hernandez then heard a gunshot and looked at the gate.

Hernandez testified she saw defendant "with his arm through the fence" and she saw a flash. Owens grabbed Hernandez and pulled her down, and she heard additional gunshots. She believed five to six shots were fired. After the last shot, Hernandez called 911 and saw Padilla lying on the ground.

## II.     The Parties Indicate a Possible Resolution.

As the prosecutor started to ask Hernandez about her prior statements to the investigating officers, the court stated they were getting close to lunch and the prosecutor agreed it was a good time to break. The court excused the jury and Hernandez for the noon recess.[10]

After the jury and the witness left the courtroom, the court addressed Mr. Alvarez, defense counsel, and asked if there was a potential resolution. Mr. Alvarez replied that the prosecutor had to consult with his office. Mr. Peterson, the prosecutor, said there was a resolution that should be "pretty straightforward." The court directed the parties to return at 1:00 p.m., and it would continue hearing evidence if the charges were not resolved. Mr. Alvarez asked the court if the clerk had a change-of-plea form. The court said it would provide one.

---

**10**     Prior to Hernandez's testimony, other detectives testified about their investigation of the murder scene and witness interviews. Detective Shecklanian testified he interviewed Carmen Hernandez on June 2, 4, and 5, 2015. When he started to testify about her prior statements, defense counsel objected, and the court ordered the limited testimony stricken as hearsay. Detective Gutknecht testified he took statements from Hernandez and Owens, and did not testify about what they said.

18.

# PLEA PROCEEDINGS

After the noon recess on February 23, 2016, the court reconvened without the jury. Defendant was present with Mr. Alvarez. Hernandez was not recalled to the stand. Instead, the prosecutor and Mr. Alvarez said they had reached a resolution of the case.

## I.     Plea Form.

The parties presented the court with a form entitled "Declaration Regarding Guilty Plea" (Declaration), with the appropriate information filled in. Defendant initialed each paragraph, and defendant and Mr. Alvarez signed the form.

The declaration stated defendant was charged with "PC 187(a) w/190.2 and 12022.53(b), (c), & (d)," first degree murder with a special circumstance and firearm enhancements; defendant would plead guilty to "1st degree murder, PC 187(a), waiver of appellate rts.," and his sentence would be 25 years to life, a fine of $10,000, and lifetime parole. There was a preprinted space for restitution, but it was not filled in.

One of the declaration's preprinted paragraphs stated defendant was not induced to plead guilty "by any promise or representation of a lesser sentence, probation, reward, immunity, or anything else, except as stated below," and the following was written in: "Dismiss special circumstance allegation along w/gun and gang enhancements."[11]

The parties stipulated to the preliminary hearing transcript and the partial trial transcript for the factual basis for the plea.

According to the declaration, defendant was in possession of all his faculties and had not consumed any drugs, narcotics, or alcoholic beverages in the prior 24 hours to impair his judgment; he did not need additional time to think about the plea; and he was entering his plea freely and voluntarily. Defendant further declared his attorney had

---

[11]     As a result of the negotiated disposition, defendant no longer faced the LWOP term plus 25 years to life.

explained the allegations in the information, and he understood the nature of the charges and possible defenses.

Defendant signed the following statement at the end of the document: "I have personally prepared and discussed with my attorney, or have read, discussed and had explained to me by my attorney, each of the above items, and I understand same." Mr. Alvarez signed a similar declaration in the document, that verified he discussed and explained the contents of the document with defendant.

## II.    Plea Hearing.

After the court reviewed the Declaration form, the prosecutor stated the parties agreed to the following disposition.

> "… [D]efendant will plead guilty to count 1, violation of … section 187(a), first degree murder, for a 25-to-life term. And there will be a waiver of appellate rights. For this plea, the People will dismiss the remaining gang and gun allegations, which would have given an exposure of life without the possibility of parole."

The court asked defendant if he heard and understood the terms of the negotiated disposition, and that he would be sentenced to 25 years to life. Defendant said yes. The court asked if he understood that he would not be eligible for parole until he had served 25 years. Defendant said yes.

The court asked defendant if he understood his waiver of appellate rights meant he was "waiving your right to complain there was any defect in … any of the proceedings leading up to this trial or in the trial itself." Defendant said yes. The court asked if any promises had been made to induce him to plead guilty, aside from the terms of the negotiated disposition. Defendant said no.

The court granted the prosecutor's motion to amend the information to strike an erroneous reference in count 1 to section 664, subdivision (a) (attempted murder), and instead allege the murder was committed willfully, deliberately, and with premeditation within the meaning of section 189, and the offense was a serious felony within the

20.

meaning of section 1192.7, subdivision (c)(1) and a violent felony pursuant to section 667.5, subdivision (c)(1).

The court asked defendant if he read and understood the details about his plea in the declaration form and had sufficient time to speak with his attorney about it. Defendant said yes. The court asked defendant if he initialed each paragraph and signed the document. Defendant said yes.

The court fully advised defendant of his constitutional rights and asked if he understood and waived each right. Defendant said yes.

The court asked if he had taken "any alcohol, drugs, or other medication to interfere with your ability to understand the things that we're discussing." Defendant said: "Yes, sir—I mean, no sir."

The court next asked about the factual basis for the plea:

"THE COURT:      …. [A]re the People willing to submit as a factual basis the preliminary hearing transcript, as well as the trial transcript up to this point?

"[THE PROSECUTOR]: Yes, your Honor. [¶] And I would just state for the record a brief summary: That on or about May 25th, 2015, in the County of Madera, the defendant did approach Demetrius Padilla while Demetrius Padilla was in his backyard that evening, and did shoot Demetrius Padilla deliberately, and with premeditation.

"THE COURT:      Mr. Alvarez, do you stipulate to that factual basis?

"MR. ALVAREZ:  *As well as to the transcripts thus far in the case, yes.*

"THE COURT:      Thank you."[12]  (Italics added.)

---

[12]      As will be discussed below, defendant contends that trial counsel was prejudicially ineffective for stipulating to the prosecutor's statement as part of the factual basis for his plea. He also asserts his attorneys during the section 1172.6 proceedings were prejudicially ineffective for failing to raise defense counsel's alleged ineffectiveness by stipulating to the factual basis, because it permitted the trial court to rely on that factual basis to find he was the actual killer and deny his petition.

The court advised defendant that if he was found guilty of count 1, he would be sentenced to 25 years to life and could be fined up to $10,000. If he was released on parole, he would be on parole for life. If he was not a citizen, his plea "would result in your deportation, your exclusion from admission to the United States, and denial of naturalization under the laws of the United States." Defendant said he understood.[13]

The court took defendant's plea:

"THE COURT: Count 1 of the Information alleges that on May 25, 2015, in the County of Madera, you committed a felony violation of … section 187, sub (a), in that you did unlawfully and with malice aforethought murder Demetrius Padilla, a human being. [¶] It's further alleged that the murder of Demetrius Padilla was committed willfully, deliberately, and with premeditation within the meaning of … Section 189 and is a serious felony pursuant to … Section 1192.7, sub (c), sub (1), and a violent felony pursuant to … Section 667.5, sub (c), sub (1)."

Defendant pleaded guilty. The court found defendant entered his plea knowingly, intelligently, and voluntarily, ordered the preparation of the probation report, and set the sentencing hearing.

Thereafter, the court called the jurors into the courtroom, stated there was a resolution of the case, and thanked and discharged them.

---

As also will be explained below, the trial court at the section 1172.6 hearing did not rely on the factual basis for defendant's plea to find he was the actual killer and instead made that determination after it reviewed the preliminary hearing and partial trial transcripts. Moreover, *Patton* disapproved of appellate decisions that "conditioned the use of preliminary hearing transcripts [to make the prima facie determination] on whether a petitioner previously admitted the truth of testimony contained therein or stipulated to the transcript as the factual basis of a plea." (*Patton, supra,* 17 Cal.5th at p. 569, fn. 12.)

[13] As noted in this court's nonpublished opinion in defendant's direct appeal, the trial court did not advise defendant that, pursuant to section 1192.5, its approval of the plea was not binding, it could withdraw its approval at the sentencing hearing, and if it did, defendant could then withdraw his plea.

## DEFENDANT'S MOTION TO WITHDRAW PLEA

On March 10, 2016, a few weeks after defendant entered his plea, defense counsel filed a motion for defendant to withdraw his guilty plea because defendant was allegedly under the influence of alcohol and possibly narcotics, and he was subject to anxiety that may have impaired his mental abilities when he entered the plea. The motion was supported by defendant's declaration that on the day of the plea, he consumed eight cups of "pruno" and took "some pills" in jail; he had mental issues; he was under extreme pressure and anxiety; and all these factors affected his ability to enter his plea. Defendant further declared his family believed that he had made a bad decision, that they wanted him to get a lawyer and take back his plea, and that they knew he was innocent.

On March 16, 2016, the People filed opposition and argued the record showed defendant indicated numerous times that he understood the consequences of his waivers and guilty plea; he declared he had not used drugs or alcohol when he signed the plea form; he made a similar statement during the plea hearing; and defendant did not display any signs of being impaired.

### I.     The Probation Report.[14]

The probation report, filed with the trial court on March 15, 2016, stated that defendant told the probation officer he intended to withdraw his guilty plea; his lawyer did not fight for him; and he got the "worst deal ever." Defendant said he did not make the right decision because of stress, anxiety, and depression. Defendant said he had never been diagnosed with any mental health conditions, and he was not taking medication. He claimed that he heard voices and suffered from anxiety and depression. Defendant said he cut himself and tried to commit suicide approximately eight times.

---

**14**     At the hearing on defendant's motion to withdraw his plea, the trial court and the parties addressed defendant's statements to the probation officer, and the probation report was addressed in this court's nonpublished opinion from his direct appeal.

23.

The probation report also addressed victim restitution. It stated that a victim services representative had submitted documentation for victim restitution for Padilla's family, including specific amounts for Padilla's hospital and funeral expenses, for a total of $8,048.69. The victim compensation program had already paid for these expenses, and the report recommended the court order all restitution payable to the California Victim Assistance Center.

The probation report recommended a sentence of 25 years to life pursuant to the terms of the plea agreement, plus a restitution fine of $300, and a specific list of separate fines, fees, and assessments of over $41,000. The probation report also recommended victim restitution of $8,048.69 payable to the Victim Assistance Center on behalf of Padilla's family. The documents in support of the victim restitution claim were attached to the probation report.

### HEARING ON MOTION TO WITHDRAW PLEA & SENTENCING

On March 29, 2016, the court convened a hearing on defendant's motion to withdraw his plea. Defendant was present with Mr. Alvarez.

The prosecutor argued that while defendant's motion and supporting declaration claimed he was on alcohol and drugs when he entered his plea, defendant did not make the same allegations when he spoke to the probation officer.

The court agreed defendant's motion claimed he was intoxicated at the plea hearing "on some jail concocted alcohol, an unidentified yellow pill. That's not referenced in the probation report. In fact, the probation report lists other reasons why [defendant] is seeking to withdraw his guilty plea. The only consistent grounds [are] that [defendant] was feeling anxiety at the time that he entered into the plea."

The court asked Mr. Alvarez if it correctly stated defendant's allegations. Mr. Alvarez replied that was "contained in the [probation report] that I received, as well as the declaration by [defendant]. I think the Court is characterizing it accurately."

24.

## I.  Denial of Motion to Withdraw.

The court found defendant was fully advised of his constitutional rights, said he understood and waived his rights, said he had not received any other promises or inducements to plead guilty aside from the plea agreement, and initialed and signed the plea form as to the same advisements.  The issue was whether defendant "was intoxicated to a point where he was unable to understand … what he was doing and understand the terms of the plea."  The court cited the plea transcript where defendant "assured the Court that he had not taken any drugs, alcohol, or medication that interfered with his plea.  Based on that, and based on my observations of [defendant], I didn't observe any behavior or anything that led me to believe that he was intoxicated at the time of the change of plea.  [¶]  Further, [defendant] represented to the probation officer that he was under stress, anxiety, and depression at the time of the sentencing.  I suspect that most people who are sentenced are stressed, experiencing anxiety, and are on one level or another depressed, and don't know that that necessarily interferes … with one's ability to understand the terms of the plea that is being offered, and whether they're in a condition to intelligently make a decision related to that plea."

The court denied defendant's motion to withdraw his plea for failing to establish good cause because "there's nothing that has been presented to the court now that changes the Court's position that [defendant] make a knowing, intelligent, and voluntary waiver of his rights.  He understood the consequences of his plea, and he entered into that plea with full knowledge of those consequences."

Defendant requested to address the court.  He was sworn and stated he suffered from mental problems; he cut himself to deal with problems; he was depressed and felt he was living in a dream during the trial; he did not understand what was going on; he heard voices; all the prosecution's witnesses were drug addicts, making up stories and lying; and it was wrong for him to go to prison for something he did not do.

The prosecutor replied that the People did not fabricate any evidence.

25.

Mr. Alvarez advised the court that defendant was "just reiterating that he was under a lot of stress, that he would like to withdraw his plea." Defendant interjected: "It was a mistake."

As to his claim of mistake, the court stated it was certainly clear at the plea hearing that defendant entered his plea knowingly, intelligently, and voluntarily, and did so after having the opportunity to discuss the matter with his attorney. "And he assured the Court, based on my inquiries on the date that he changed his plea, that all of those factors were true."

## II.    Sentencing.

The court proceeded with the sentencing hearing and heard statements from members of Padilla's family about the impact of his murder. Defense counsel did not object to the probation report's recommendation for victim restitution, but argued the court should stay the additional recommendation for imposition of over $41,000 in separate fines and fees because of defendant's inability to pay and the severity of his life sentence.

The court sentenced defendant to 25 years to life for murder, plus a $300 restitution fine pursuant to section 1202.4, subdivision (b). The court imposed a victim restitution order for $8,048.69 pursuant to section 1202.4, subdivision (f), payable to the Victim Assistance Center. The court separately imposed other fines, fees, and assessments for a total of $41,430.

The court advised defendant that while he waived his appellate rights as part of his plea agreement, he had the right to appeal from the court's denial of his motion to withdraw his plea.

Defendant filed a notice of appeal to challenge the validity of his plea and sentence and sought and received a certificate of probable cause based on "ineffective assistance" and his alleged intoxication at the time of his plea.

## DIRECT APPEAL

On appeal from the judgment, defendant argued the trial court should have granted his motion to withdraw his guilty plea. In doing so, however, defendant relied on a reason not given in his motion to withdraw, and asserted he was not advised that the court would impose a victim restitution order as a condition of his plea.

On June 6, 2018, this court filed the nonpublished opinion in *Holguin I*, and found defendant's waiver of appellate rights as part of his plea agreement did not include the waiver of an appeal from the denial of his motion to withdraw his plea, possible future errors that allegedly occurred after his plea, or a claim of ineffective assistance in connection with the making of the plea and waiver agreement.

As for the merits of his claim, we agreed the trial court did not read the section 1192.5 restitution admonishment at the plea hearing or advise him about a potential restitution order, but held defendant was not entitled to withdraw his plea and defense counsel's failure to so advise was not prejudicial, because counsel argued the court should stay and not impose the additional fines and fees.

On September 12, 2018, the California Supreme Court denied defendant's petition for review.

## SECTION 1172.6 PETITION FOR RESENTENCING

On October 26, 2022, defendant filed, in propria persona, a petition in the trial court for resentencing of his first degree murder conviction pursuant to section 1172.6, and requested appointment of counsel.

Appellant filed a supporting declaration that consisted of a preprinted form where he checked boxes that (1) he was eligible for resentencing because a complaint, information, or indictment was filed that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) he pleaded guilty or no contest to first or second degree murder in lieu of going to trial because he believed he could have been convicted of first or second degree murder

27.

at trial pursuant to the felony murder rule or the natural and probable consequences doctrine; (3) he could not presently be convicted of first or second degree murder because of changes made to section 188 and 189, effective January 1, 2019; (4) he could not now be convicted of first degree murder because of changes to section 189, effective January 1, 2019, because he was not the actual killer; he did not, with the intent to kill, aid, abet, counsel, solicit, request, or assist the actual killer in commission of first degree murder; he was not a major participant in the felony or act with reckless indifference to human life during the course of the crime or felony; the victim was not a peace officer; and (6) there has been a prior determination by a court or jury that he was not a major participant and/or did not act with reckless indifference to human life under section 190.2, subdivision (d), and was entitled to resentencing.

On November 21, 2022, the court appointed the public defender's office to represent defendant.

## I.     The People's Opposition.

On December 21, 2022, the People filed opposition to the petition and argued defendant failed to state a prima facie case for relief and attached the transcript from the plea hearing as a supporting exhibit. The People argued that when defendant entered his plea, the prosecutor stated the factual basis was based on the preliminary hearing and partial trial transcripts, and the prosecutor also stated "a brief summary" of the evidence, that it showed defendant shot and killed Padilla. Defense counsel stipulated to the record and the prosecutor's summary for the factual basis.

The People argued defendant's petition failed to state a prima facie case for resentencing because the factual basis stipulation at the plea hearing amounted to an adoptive admission, and showed defendant was the actual killer and ineligible for relief as a matter of law.

## SUBSTITUTIONS OF DEFENSE COUNSEL

After the court appointed the public defender's office to represent defendant on his section 1172.6 petition, the court relieved appointed counsel and appointed new attorneys for various reasons, which resulted in numerous continuances of the proceedings.

On January 17, 2023, defendant filed a motion in propria persona for appointment of a new attorney because the public defender never contacted him, previously represented defendant's brother, and did not do anything for him.

On January 27, 2023, the court relieved the public defender and appointed the Madera Alternate Defense office.  On March 13, 2023, the Madera Alternate Defense office declared a conflict and requested appointment of "wheel" attorney Cristobal Perez. On March 24, 2023, the court relieved Madera Alternate Defense and appointed Mr. Perez to represent defendant.

## I.    Marsden Hearing.[15]

On April 28, 2023, the court convened a status hearing on defendant's section 1172.6 petition.  Defendant was present with Mr. Perez and immediately moved to discharge Mr. Perez pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.  Thereafter, the court conducted a confidential hearing on the *Marsden* motion.

### A.    *Confidential hearing*.

At the *Marsden* hearing, defendant complained Mr. Perez disagreed with his strategy on the petition and failed to meet with him about his case.  Defendant also complained that Mr. Perez would not address ineffective assistance claims arising from the plea hearing.

---

[15]    When a defendant raises a *Marsden* issue or an issue related to *Marsden* on appeal, this court and the parties may address the contents of the in camera *Marsden* hearing.  (Cal. Rules of Court, rule 8.47; *People v. Knight* (2015) 239 Cal.App.4th 1, 7–8.)  By prior order, and without objection from the parties, we have unsealed appellant's opening brief and will address the court's ruling at the *Marsden* hearing.

Mr. Perez said that when defendant stipulated to the factual basis for his plea at the plea hearing, that constituted an adoptive admission that he was the actual killer for purposes of the prima facie finding. As for defendant's ineffective assistance complaints, Mr. Perez stated he was a friend of Mr. Alvarez, who represented defendant at trial, and he did not feel comfortable arguing that Mr. Alvarez was ineffective or having to cross-examine him at an evidentiary hearing if necessary.

The court found a conflict and relieved Mr. Perez.

After the *Marsden* hearing, the court reconvened in the presence of the prosecutor and stated it granted defendant's *Marsden* motion and relieved Mr. Perez. The court appointed Alexander Martin.

In May and September 2023, the court relieved Mr. Martin because of a conflict, and appointed Samuel Lutton, followed by Regina Adams, and discharged them because of conflicts.

## II.     Appointment of Fitzgerald Firm.

On September 29, 2023, the court appointed the Fresno office of Fitzgerald, Alvarez & Ciummo (FAC Fresno) to represent defendant.

On October 5, 2023, Richard Dunia from the FAC Fresno firm appeared with defendant, and requested a continuance because he did not have a definite answer as to whether his firm had a conflict.

### A.     *Defendant's reply brief.*

On October 10, 2023, Emily Takao of the FAC Fresno firm filed defendant's reply brief in support of his section 1172.6 petition, and cited authorities that held the trial court could not make the prima facie determination based on this court's nonpublished opinion in his direct appeal, or by reviewing the preliminary hearing transcript. Defendant argued his petition was facially valid and stated a prima facie case, and an evidentiary hearing should be held.

30.

## DENIAL OF DEFENDANT'S SECTION 1172.6 PETITION

On October 12, 2023, the court convened the prima facie hearing on defendant's section 1172.6 petition. Defendant was present with Mr. Dunia of the FAC Fresno firm.

Mr. Dunia advised the court that at the last hearing, he was asked if he had any conflicts to represent defendant. "My secretaries had double-checked. There is no conflict. We're prepared to help [defendant] out in this matter. [¶] I am prepared to go forward today."

The court asked Mr. Dunia if he was prepared to go forward for defendant, or whether it was Ms. Takao's case. Mr. Dunia stated this was Ms. Takao's case and she filed the reply brief, but she out of town and unable to appear. Mr. Dunia stated he would request a continuance if the court had questions about the case for Ms. Takao, and if not, he would submit the matter.[16]

Ms. Williamson, the prosecutor, stated the case was assigned to Mr. Peterson in their office, she was appearing for him because he was sick, and his notes indicated this was supposed to be a setting hearing. Ms. Williamson said she was prepared to submit the matter, but she would also request a continuance for Mr. Peterson to appear if the court had questions.

The court reviewed defendant's petition and the parties' briefs and said it did not have any questions and believed "it's just a legal issue on whether there is … a prima facie case has been established. And I think I have enough information to rule on it."

The court asked Mr. Dunia if the matter was submitted.

"MR. DUNIA:     Your Honor, the issue that I'm having is I'm prepared to submit on the papers Ms. [Takao] filed. [Defendant] is in disagreement

---

[16]     The reporter's transcript quotes the court and attorneys as referring to the attorney who filed defendant's reply brief as "Ms. Tecow." It appears the reporter misunderstood either the spelling or pronunciation of Ms. Takao's name since they were clearly referring to her reply brief. We will use Ms. Takao's correctly spelled name.

31.

as far as if that is what he would like done.  [¶]  I'm prepared to submit on the papers, though.

"THE COURT:      Do you have any additional legal arguments to present as to the issue of whether there's been a prima facie case established?

"MR. DUNIA:      Your Honor, I don't have any additional legal arguments with regards to that.  *[Defendant] wants to present additional new evidence, should the Court find it there—additional new evidence.  I explained that that is the second phase.  He wants to have that be included in the first phase.*

"THE COURT:  That's not part of this process.  [¶]  First, there has to be a prima facie case established.  And that's what this hearing is all about."[17] (Italics added.)

## I.      The Court's Denial of the Petition.

The court stated that to make the prima facie finding under section 1172.6, it "must consider the factual allegations in the petition as true and make a preliminary assessment regarding whether the petitioner is entitled to the relief requested.  [¶]  The Court shouldn't make any credibility determinations or weigh the evidence in the matter before conducting an evidentiary hearing following the issuance of an order to show cause.  The Court may, however, rely on the record of conviction in evaluating whether the order to show cause should issue."

The court stated that based on the interpretations of section 1172.6 in *People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*) and *People v. Delgadillo* (2022) 14 Cal.5th 216, it would rely on the "record of conviction in evaluating whether the order to show cause should issue" because the record allowed the court "to distinguish petitions with potential merit from those that are clearly meritless."  The court would not engage in fact finding, weighing of evidence, or exercising discretion, but "when the record makes it clear that

---

[17]      In issue VIII, *post*, we will address defendant's contentions based on this exchange, that Mr. Dunia violated attorney-client confidentiality by referring to confidential discussions with his client, and that the trial court improperly prevented defendant was presenting additional evidence in support of his petition.

the petitioner was the actual killer and the only participant in the killing, the petitioner is not entitled to relief under [section] 1172.6."

The trial court reviewed the preliminary hearing and partial trial transcripts as part of the record of conviction and made the following findings.

> "So in reviewing the Court's record and the record of conviction in this matter, on October 2, 2015, Carmen Hernandez testified at the preliminary hearing in this case.
>
> "Ms. Hernandez testified that on May 25, 2015, she and her boyfriend, James, were sitting with the decedent, Demetrius Padilla, in Demetrius's backyard. She heard a whistle coming from a wrought iron gate leading to the backyard, and she saws a person standing at the gate, whom she identified as [defendant].
>
> "Carmen testified that Demetrius approached the gate to speak with [defendant]. She turned away and she heard gunshots. When she looked back at the gate from the direction from where she heard the gunshots, she saw Demetrius laying on the ground. Carmen testified at the preliminary hearing that she saw [defendant's] arm extended through the gate, shooting a gun.
>
> "During her testimony at trial and before [defendant] changed his plea to 'guilty,' Carmen again testified that [defendant] was the person who shot Demetrius.
>
> "There's no evidence offered at the preliminary hearing or trial to indicate that anyone other than [defendant] was standing at the wrought iron gate, firing the gun at Demetrius. The record of conviction in this matter makes it clear that [defendant] was the actual killer and the only participant in the killing of Mr. Padilla.
>
> "Accordingly, there is no prima facie case established, because [defendant] was the actual killer, and may still be convicted, even after the amendments to … Sections 188 and 189."

Defendant attempted to personally address the court. The court advised defendant that he could file an appeal from the denial of the section 1172.6 petition and raise any issues he had with the process. Defendant tried to interrupt. The court said that defendant could not "present some new evidence" because "[t]his is purely a legal issue.

It's just the application of the statute and the Supreme Court's decision. [¶] So there's really nothing more to discuss. But you have the right to appeal.…"

On October 13, 2023, defendant filed a timely notice of appeal from the denial of his section 1172.6 petition.

## DISCUSSION

Defendant asserts that even though *Patton* now permits a trial court to rely on the preliminary hearing transcript to make the prima facie determination on a section 1172.6 petition, the evidence at both the preliminary hearing and partial trial was conflicting and required the court to make credibility determinations and factual findings that should have been made at an evidentiary hearing.

The People argue *Patton* applies to this case, and the preliminary hearing and partial trial transcripts established that defendant was the only person identified as the actual killer of Padilla, and the trial court correctly found he was ineligible for resentencing as a matter of law.

## I.     Section 1172.6.

We begin with the provisions of section 1172.6. "Effective January 1, 2019, Senate Bill No. 1437 (2017−2018 Reg. Sess.) amended the felony-murder rule by adding section 189, subdivision (e). [Citation.] It provides that a participant in the qualifying felony is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life. [Citation.] The Legislature also amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*People v. Harden* (2022) 81 Cal.App.5th 45, 50– 51; *People v. Strong* (2022) 13 Cal.5th 698, 707– 708; *People v. Reyes* (2023) 97 Cal.App.5th 292, 295.)

Effective January 1, 2022, Senate Bill No. 775 (2020–2021 Reg. Sess.) (Senate Bill 775) amended former section 1170.95 in several respects, codified the holding in *People v. Lewis* (2021) 11 Cal.5th 952 and clarified that, in some circumstances, the same relief available to persons convicted of murder is also available to persons convicted of attempted murder or manslaughter, and addressed various aspects of the petition procedure, including the petitioner's right to counsel, the standard for determining the existence of a prima facie case, the burden of proof at the hearing to determine whether a petitioner is entitled to relief, and the evidence a court may consider at that hearing. (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865 & fn. 18; *People v. Hurtado* (2023) 89 Cal.App.5th 887, 892.)  On June 30, 2022, the statute was renumbered as section 1172.6 without further substantive changes.  (*People v. Saibu* (2022) 81 Cal.App.5th 709, 715, fn. 3.)

Section 1172.6, subdivision (a) thus states that a person may file a petition for resentencing if "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter .…"

As relevant herein, the petitioner must declare "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine.  (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder.  (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to

35.

Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)–(3); *Patton*, *supra*, 17 Cal.5th at p. 558.)

"[W]hen a petitioner files a facially sufficient petition, the trial court must appoint counsel to represent the petitioner. The trial court may consider the record of conviction to determine whether the petitioner makes a prima facie showing only after the appointment of counsel and the opportunity for briefing has occurred." (*People v. Reyes*, *supra*, 97 Cal.App.5th at p. 298; *Patton, supra*, 17 Cal.5th at p. 559.)

In making the prima facie determination, the trial court "may look at the record of conviction … to determine whether a petitioner has made a prima facie" showing. (*Lewis, supra*, 11 Cal.5th at p. 971.) "The record of conviction will necessarily inform the trial court's prima facie inquiry under section 1170.95, allowing the court to distinguish petitions with potential merit from those that are clearly meritless. This is consistent with the statute's overall purpose: to ensure that murder culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of a single-step prima facie review process. [Citation.] [¶] While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section [1172.6] relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid.*)

The amendments to sections 188 and 189 did not invalidate murder convictions based on the theory that the defendant was the actual killer.  (*People v. Strong, supra*, 13 Cal.5th at p. 707; *People v. Mares* (2024) 99 Cal.App.5th 1158, 1166–1167.)  Where the record of conviction shows the defendant was the actual killer, he was not convicted under a now-invalid imputed malice theory and ineligible for relief as a matter of law, and no evidentiary hearing is required.  (*People v. Harden, supra,* 81 Cal.App.5th at pp. 47–48, 52; *People v. Garcia* (2022) 82 Cal.App.5th 956, 973.)

If the trial court commits error in making the prima facie finding to deny the petition without an evidentiary hearing, the error is harmless if the defendant is ineligible for resentencing as a matter of law.  (*Lewis, supra*, 11 Cal.5th at pp. 973–974.)

## II.    Patton.

At the time of the hearing on defendant's petition, and the initial briefing in this appeal, it was settled that when a petitioner is convicted after a jury trial, the trial court may rely on the record of conviction to make the prima facie determination pursuant to section 1172.6, and the record of conviction includes the charging documents, jury instructions, and verdicts.  (*People v. Harden, supra,* 81 Cal.App.5th at pp. 50, 54–55; *People v. Flores* (2023) 96 Cal.App.5th 1164, 1170.)

It was also settled that "[a]lthough the trial court may consider the 'procedural history' of a prior appellate opinion at the evidentiary hearing (§ 1172.6, subd. (d)(3)), it cannot consider the factual summary of a prior appellate opinion at any stage of the section 1172.6 petition process [citation]."  (*People v. Glass* (2025) 110 Cal.App.5th 922, 929; *Lewis, supra*, 11 Cal.5th at p. 972; *People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1237–1238.)

Also at that time, however, appellate courts disagreed about the nature of the record of conviction when a petitioner is convicted after entering a plea and subsequently files a section 1172.6 petition for resentencing.  The appellate courts were divided on whether the trial court could review the preliminary hearing transcript as part of the

record of conviction to make the prima facie determination. Some courts held such reliance was only permissible if the petitioner stipulated to the preliminary hearing transcript as the factual basis for the plea. (*Patton, supra*, 17 Cal.5th at p. 561.)

There were also appellate decisions that held the trial court could not rely on the preliminary hearing transcript to make the prima facie determination, because such reliance necessarily required making factual findings, and an evidentiary hearing was required to determine if a petitioner who was convicted after a plea was eligible for resentencing pursuant to section 1172.6. (*Patton, supra*, 17 Cal.5th at pp. 561–562.)

In *Patton*, the California Supreme Court resolved this disagreement and held that in making the prima facie determination, the preliminary hearing transcript "preceding a guilty plea" (*Patton*, *supra*, 17 Cal.5th at p. 568) is part of the record of conviction and the trial court may "rely on unchallenged, relief-foreclosing facts within a preliminary hearing transcript to refute [the petitioner's] conclusory, checkbox allegations" (*id*. at p. 564).

*Patton* acknowledged that the court previously "placed limits on the use of preliminary hearing transcripts to prove disputed facts, but these limits are inapplicable here." (*Patton, supra*, 17 Cal.5th at p. 568.) *Patton* explained resolution of the prima facie inquiry may not "call for resolution of a factual dispute" but, "[r]ather than resolving a contested factual dispute, statements within … [*the*] *preliminary hearing transcript* [*may*] *contribute*[] *specific factual assertions about* [*the petitioner's*] *conviction — namely, that it was premised on him being the sole shooter*. [A petitioner's] conclusory checkbox allegations alone could not create a factual dispute about whether he played a meaningfully different role in the [completed or attempted homicide]." (*Id*. at pp. 568–569, italics added.)

*Patton* held previous appellate rulings which prohibited reliance on the preliminary hearing transcript "overlooked the issue-framing role a transcript can play" in making the prima facie determination. (*Patton, supra*, 17 Cal.5th at p. 569.)

"[A] section 1172.6 petitioner who, despite having access to counsel upon submission of a facially sufficient petition, offers only conclusory allegations of entitlement to relief, in response to a record of conviction that demonstrates the petitioner's conviction was under a still-valid theory, has not … made a prima facie showing.  Where facts from the record of conviction are undisputed, accepting them over contrary legal allegations that are merely conclusory is not ' "factfinding involving the weighing of evidence or the exercise of discretion." ' [Citations.]  Indeed, denial of a resentencing petition because its conclusory allegations do not counter the facts in a record of conviction that forecloses relief is a determination that the petition's allegations are legally deficient, 'not a ruling on the merits of the issues which petitioner has attempted to raise.' [Citation.]" (*Id.* at pp. 565–566, fn. omitted.)

*Patton* explained that "petitioners need not, at the prima facie stage, meet an evidentiary burden of proof to establish entitlement to relief, such as the burden of proof applicable to the People if trying to defeat relief at the later [section 1172.6,] subdivision (d)(3) [evidentiary] hearing.  *Rather, petitioners confronting a record of conviction that demonstrates relief is unavailable have the burden of coming forward with nonconclusory allegations to alert the prosecution and the court to what issues an evidentiary hearing would entail.*  It follows from what we have said already that should a trial court encounter a material fact dispute, the court may not resolve that dispute at the prima facie stage and should instead grant petitioner an evidentiary hearing, assuming relief is not otherwise foreclosed." (*Patton, supra*, 17 Cal.5th at pp. 566–567, italics added.)

"Thus, while it may be that a record can ' " 'refut[e] the allegations made in the petition' " ' [citation], it would be somewhat imprecise to say that evidence in a preliminary hearing transcript, offered at the prima facie stage, ' "irrefutably *establishes*" ' any particular fact to any particular standard of proof [citation].  A conclusion that a record refutes an allegation at the prima facie stage is not, moreover, a conclusion about the strength of evidence in the record." (*Patton, supra*, 17 Cal.5th at p. 567, fn. 10.)

"A dispute regarding the basis of a conviction might arise if, for instance, a petitioner points to specific facts that identify someone else as the direct perpetrator.  At the least, as the People note …, this may come from the record itself.  *But absent specific facts, no such dispute arises … from mere latent, speculative possibilities; that is, a hypothetical alternate direct perpetrator cannot be conjured from thin air or a legal conclusion.*"  (*Id.* at p. 567, italics added.)

*Patton* further explained that a petitioner has multiple opportunities to proffer specific facts to raise such a dispute because "the initial petition itself, which is not limited to the allegations found on preprinted forms, begins, but does not end, the inquiry.  Subdivision (c) [of section 1172.6] expressly anticipates a petitioner's reply to the People's response and, '[a]fter the parties have had an opportunity to submit briefings,' arguments at a hearing." (*Patton, supra*, 17 Cal.5th at p. 567.)  The trial courts should "implement section 1172.6 so that petitioners have 'meaningful' opportunities to present their petitions.  [Citations.]  Nothing in subdivision (c), for instance, has dissuaded courts from, as appropriate, permitting a substitute petition for resentencing after appointment of counsel." (*Id.* at p. 568.)[18]

*Patton* disapproved of prior appellate decisions that "conditioned the use of preliminary hearing transcripts [to make the prima facie determination] on whether a petitioner previously admitted the truth of testimony contained therein or stipulated to the transcript as the factual basis of a plea." (*Patton, supra*, 17 Cal.5th at p. 569, fn. 12.)

*Patton* applied these conclusions to affirm the trial court's denial of the defendant's petition in that case.  The defendant had been charged with premeditated

---

**18**      *Patton* cautioned that "[t]he extent to which it might be proper to rely on a preliminary hearing transcript *at the evidentiary hearing* under section 1172.6, subdivision (d) is not before us.  At such a hearing, the statute permits consideration of 'evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed' except 'hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 … , unless the evidence is admissible pursuant to another exception to the hearsay rule.' " (*Patton, supra*, 17 Cal.5th at p. 569, fn. 11, italics added.)

attempted murder and other offenses with gang, firearm, and great bodily injury enhancements. At the preliminary hearing, "police officers recounted watching surveillance video of a shooting at a motel office. The court received into evidence several still photos from the video depicting a shooter firing his gun at a victim. An officer who was familiar with [the defendant] from previous encounters identified him as the shooter in the video. Another officer testified the shooter in the video was wearing jeans matching those [the defendant] was wearing in a photograph police later acquired. The defense presented no evidence." (*Patton, supra*, 17 Cal.5th at p. 557, fn. omitted.) The defendant pleaded no contest to attempted murder and admitted the section 12022.53, subdivision (c) enhancement, that he personally and intentionally discharged a firearm in the commission of the offense, and the People agreed to dismiss the premeditation allegation and remaining charges. The defendant's attorney concurred in the plea and " 'stipulated to a factual basis,' " and the defendant was sentenced to 29 years. (*Patton*, at p. 558.)

The defendant later filed a section 1172.6 petition for resentencing by using "a preprinted form developed by the Office of the State Public Defender, he checked boxes next to statements indicating that he met the statutory conditions for relief," and "[f]ollowing the form's minimalist prompts, he offered no specific facts in support of these statements." (*Patton, supra*, 17 Cal.5th at p. 559.) The People's opposition argued the preliminary hearing transcript showed the defendant was the sole participant in the shooting and he admitted the personal discharge enhancement, so that he was convicted as the direct perpetrator of the crime. The defendant's counsel did not file a reply. (*Ibid*.) At the prima facie hearing, the trial court relied on the preliminary hearing and plea transcript, and found the defendant was the actual shooter who acted alone "under the unrebutted preliminary hearing transcript." (*Id*. at p. 560.) The appellate court affirmed and held the trial court properly relied on the preliminary hearing transcript as part of the record of conviction. (*Id*. at pp. 560–561.)

*Patton* affirmed the trial court's prima facie finding because the defendant's petition "offered only conclusory allegations of entitlement to resentencing relief under section 1172.6 in response to a record of conviction that the lower courts viewed as foreclosing it because that record foreclosed the conclusion that [the defendant's] conviction was under a now-invalid homicide theory. [The defendant's] petition contains only a checkbox declaration with legal conclusions, he submitted no reply, and he made no argument when invited to do so at the prima facie hearing. After determining the facial validity of a resentencing petition and before ordering an evidentiary hearing, a trial court may properly … reference the record of conviction to ' " 'refut[e]' " ' [citation] conclusory allegations in furtherance of its statutorily required screening function at that juncture of a section 1172.6 proceeding. The Court of Appeal correctly concluded this is not impermissible factfinding and correctly concluded [the defendant] had not, on the record before it, made a prima facie showing." (*Patton, supra*, 17 Cal.5th at p. 569.)

While *Patton* held the trial court's prima facie finding as to defendant's petition was not erroneous, it granted the defendant's request "to be permitted to plead additional facts on remand" and, "out of an abundance of caution," ordered remand to the trial court "with directions for that court to consider an amended petition should [the defendant] within 30 days of that remand, seek to file one." (*Patton*, *supra*, 17 Cal.5th at pp. 569–570.)

## III. The Trial Court Correctly Relied on the Preliminary Hearing and Partial Trial Transcripts to Deny Defendant's Petition.

In this case, the trial court conducted the prima facie hearing on defendant's petition prior to the decision in *Patton*, inferentially determined the preliminary hearing and partial trial transcripts were part of the record of conviction, and found defendant was the actual killer and ineligible for resentencing as a matter of law.

In light of *Patton*, we find that the trial court properly relied on these transcripts to make the prima facie determination that defendant was the actual killer of Padilla, and

ineligible for resentencing since he was not charged and did not plead guilty pursuant to now-invalid imputed malice theories of murder.

The transcripts showed that at both the preliminary hearing and abbreviated trial, Carmen Hernandez identified defendant as the gunman who stood at the gate and whistled to get Padilla's attention, Padilla walked toward him, and defendant fired multiple shots at Padilla. Hernandez recognized defendant from her employment at Herrera's bar, and knew defendant and Herrera were friends and possibly relatives. She was very familiar with Herrera's associates, and never stated or testified that she thought Herrera or another person was the gunman.

The investigating officers testified they did not find any shell casings at the murder scene. Patricia Valencia testified that late on the same night as the shooting, defendant arrived at the residence where she was staying with her boyfriend, Jose Ochoa. Both Valencia and Ochoa testified defendant produced shell casings, asked Ochoa to get rid of the shells, and Ochoa refused. Valencia reported that she heard Ochoa yelling at defendant that "he was dumb and what did he do it for." Ochoa also testified about his later conversations with defendant, and defendant's inculpatory statements regarding the shooting.

At trial, Ochoa again testified that defendant showed up at the residence where he was staying with his girlfriend, defendant showed him four or five shell casings, asked Ochoa to get rid of them, and Ochoa refused. He again testified about defendant's inculpatory statements during their subsequent meetings, when defendant "insinuated" that he was involved, said he had a "run in" with defendant at a store earlier on the day of the murder, and he " 'let that fool have it.' "

*Patton* explained that "[the] preliminary hearing transcript [may] contribute[] specific factual assertions about [the petitioner's] conviction — namely, that it was premised on him being the sole shooter. [A petitioner's] conclusory checkbox allegations

43.

alone could not create a factual dispute about whether he played a meaningfully different role in the [completed or attempted homicide]." (*Patton, supra*, 17 Cal.5th at p. 569.)

The testimony from defendant's preliminary hearing and partial trial similarly refuted the "[c]onclusory allegations, such as the checkbox ones offered" in defendant's form petition. (*Patton, supra*, 17 Cal.5th at p. 564.) The court was not required to resolve any credibility issues about the witnesses to find the felony-murder rule and/or the natural and probable consequences doctrine were not implicated in this case. Defendant did not present any evidence at the preliminary hearing, but based on counsel's cross-examination of the witnesses, it appears defendant's argument was mistaken identification. Defendant was not facing conviction for murder under the now-invalid imputed malice theories of the felony-murder rule or the natural and probable consequences doctrine, and the trial court correctly found he failed to make a prima facie case for resentencing since he was the actual killer and ineligible for relief.

## IV.    Defendant's Arguments.

Defendant acknowledges the holding in *Patton*, and that a trial court may rely on the preliminary hearing transcript as part of the record of conviction to make the prima facie finding.

Defendant asserts that in contrast to *Patton*, however, the evidence in the preliminary hearing and partial trial transcripts that he was the actual killer was not undisputed, and the court was still required to make factual findings because the witnesses gave inconsistent statements, their credibility was impeached, and there was evidence at both the preliminary hearing and trial suggesting other people were involved in the murder. Defendant also raises several ineffective assistance arguments based on both the plea hearing and the prima facie hearing. We now address his contentions.

### A.    *Defendant's continued attacks on his plea*.

As explained above, while defendant waived his appellate rights as part of the negotiated disposition, he maintained the right to file an appeal from the trial court's

denial of his motion to withdraw his plea. This court filed a nonpublished opinion that fully addressed defendant's arguments and affirmed the trial court's denial of his motion to withdraw.

In the course of this appeal from the denial of defendant's section 1172.6 petition, however, defendant continues to suggest his plea was invalid for various reasons. In challenging the denial of his petition, defendant states his jury trial "was cut short." Defendant's jury trial was not "cut short" because of any actions by the court or the People, but by defendant's agreement to plead guilty to murder pursuant to the negotiated disposition that resulted in dismissal of the special circumstance and the firearm enhancements, which eliminated the LWOP sentence.

Defendant further states that even though he pleaded guilty to murder, he immediately sought to revoke his plea "by a written declaration, signed by [defendant] under penalty of perjury, maintaining his innocence…." He admits that in his direct appeal, this court affirmed the denial of his motion to withdraw his plea, but asserts that "[i]n subsequent years, [defendant] continued to file unsuccessful challenges in the trial court, trying to undo the plea, arguing, among other things, the ineffective assistance of his trial counsel." In doing so, defendant apparently tries to connect his prior and current ineffective assistance claims to undermine both his plea and the denial of his petition for resentencing.

In making these arguments, defendant cites to his post-judgment motions and petitions that are part of the instant record on appeal. Defendant filed these pleadings in the trial court, in propria persona, and all his motions and petitions were denied. In these pleadings, defendant raised ineffective assistance claims based on defense counsel's alleged failure to raise issues in support of his motion to withdraw his plea, and failure to advise him about his constitutional rights, the consequences of the plea, the restitution order, that he would not receive overnight visits in prison, and he would be placed on parole for the rest of his life. These contentions are refuted by the record of his plea. In

45.

addition, this court's opinion in the direct appeal held the trial court's failure to advise defendant about the possibility of a victim restitution order did not violate the plea agreement or permit defendant to withdraw his plea since victim restitution was mandatory.

Also in his postjudgment pleadings, defendant asserted the trial court, the prosecutor, and defense counsel were "corrupt" because they worked for and with the "Lumanati," he wanted a new attorney who was not tied to the "Lumanati" or the "Masons," a prison guard told him the trial judge belonged to "the prosecution's Masonic court," defendant would have been released if he had a lawyer "like Kyle Rittenhouse" did, and defense counsel never advised him that he would be forced to work like a "slave" in prison.

"The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error …. To the contrary, '[n]othing in the language of section [1172.6] suggests it was intended to provide redress for allegedly erroneous prior factfinding…. The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' " (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947; *People v. DeHuff* (2021) 63 Cal.App.5th 428, 438; *People v. Burns* (2023) 95 Cal.App.5th 862, 867–868.)

Defendant's continued assertions about the alleged invalidity of his plea, counsel's alleged ineffective assistance at the plea hearing, and the trial court's denial of his motion to withdraw his plea, were rejected by this court in his direct appeal and found meritless in his post-judgment motions and petitions. These contentions are not cognizable in this appeal from the denial of his section 1172.6 petition.

**B.** ***Defendant's alleged "immunity" from being found to be the gunman.***

As a separate matter from his assertions about his plea, defendant asserts he pleaded guilty "in exchange for inter alia the dismissal of" the enhancement for personal

discharge of a firearm, and his "actual plea agreement *promised immunity from the allegation that he personally shot Mr. Padilla.*"  (Italics added.)

Defendant claims he "agreed to accept a guilty plea in exchange for a dismissal of the allegation that he personally and intentionally shot the gun, proximately resulting in the victim's death."  Defendant argues this alleged "fact" distinguishes this case from the situation in *Patton*, where the defendant in that case admitted a firearm enhancement and that he was the gunman.

Defendant thus concludes that when he entered his plea, he "specifically rejected the allegation that he was the person who personally shot Mr. Padilla" and "specifically refused to admit he was the shooter," so that there is "a material, factual dispute as to who shot" Padilla regardless of his plea to murder.

In entering into a plea agreement or negotiated disposition, " 'the defendant agrees to plead guilty in order to obtain a reciprocal benefit, generally consisting of a less severe punishment than that which could result if he were convicted of all offenses charged. [Citation.]  This more lenient disposition of the charges is secured in part by prosecutorial consent to the imposition of such clement punishment [citation], by the People's acceptance of a plea to a lesser offense than that charged, either in degree [citations] or kind [citation], or by the prosecutor's dismissal of one or more counts of a multi-count indictment or information….  [I]mplicit in all of this is a process of "bargaining" between the adverse parties to the case—the People represented by the prosecutor on one side, the defendant represented by his counsel on the other—which bargaining results in an agreement between them.' "  (*People v. Allan* (1996) 49 Cal.App.4th 1507, 1514.)

The record does not support defendant's assertions that he pleaded guilty to murder based on the condition that dismissal of the firearm enhancements meant he could never be found to be the actual gunman.  Defendant was charged with murder with a special circumstance, along with multiple firearm enhancements.  If he had been convicted after a jury trial and the special allegations found true, defendant faced a

47.

maximum possible sentence of LWOP for special circumstance murder plus 25 years to life for a section 12022.53, subdivision (d) firearm enhancement.

Defendant entered his plea on the fourth day of the prosecution's evidence, after Hernandez again identified him as the actual killer, and before defense counsel cross-examined Hernandez. As a result of the plea, defendant no longer faced the LWOP term or addition terms for the firearm enhancements, and he was sentenced to 25 years to life for murder.

In claiming that his "actual plea agreement promised immunity from the allegation that he personally shot Mr. Padilla," defendant cites the clerk's transcript in this appeal at page 18, which is final page of his change-of-plea form. This document does not support his "immunity" claim from ever being found as the actual killer. Paragraph 17 of the form begins with preprinted language that stated: "I have not been induced to plea[d] GUILTY by any promise or representation of a lesser sentence, probation, reward, immunity, or anything else, except as stated below.…" This statement was followed by spaces to write in the terms of the plea agreement, and the following language was filled in: "Dismiss special circumstance allegation along w/gun and gang enhancements."

While the negotiated disposition provided that the defendant would not be tried and convicted of special circumstance murder with firearm enhancements, the record does not support defendant's claim that the negotiated disposition was specifically conditioned on dismissal of the firearm enhancements that granted him some type of "immunity" from a postjudgment determination that he was the actual killer. The determination that defendant was the actual killer did not belatedly expose him to an increased sentence but instead resulted in defendant not being eligible for a reduced under section 1172.6. (See, e.g., *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1527 ["[W]hen a plea bargain calls for striking an enhancement, that merely means the enhancement cannot be used to enhance the current conviction"].)

Finally, defendant argues that *Patton* held the petitioner therein was the actual killer because of both the preliminary hearing evidence and his admission to the charged firearm enhancement, and the absence of a similar admission in this case is inconsistent with the trial court's finding that defendant was the actual killer. The firearm enhancements that were alleged in this case were never sent to a jury, and the court did not dismiss the enhancements pursuant to a motion to strike for insufficient evidence. Instead, the court dismissed the special circumstance *and* the firearm enhancements consistent with the terms of the negotiated disposition.

Moreover, a true finding on a section 12022.53 firearm enhancement would not necessarily mean that a petitioner was the actual killer for purposes of a section 1172.6 petition. (See, e.g., *People v. Jones* (2003) 30 Cal.4th 1084, 1119–1120; *People v. Young* (2005) 34 Cal.4th 1149, 1205; *People v. Garrison* (2021) 73 Cal.App.5th 735, 743; *People v. Offley* (2020) 48 Cal.App.5th 588, 598–599.)

The absence of a true finding on a firearm enhancement as part of defendant's negotiated disposition was not inconsistent with the record of conviction showing defendant was the actual killer and ineligible for resentencing.

## C. *The credibility of the witnesses*.

While defendant acknowledges the holding in *Patton*, and that the trial court relied on the preliminary hearing and partial trial transcripts to make the prima facie determination, he argues there was "a material dispute" in this case about the gunman's identity because both Hernandez and Ochoa were impeached and had credibility problems. Defendant asserts Hernandez's testimony was undermined by her admission that she failed to reveal defendant's identity as the gunman in her first and second interviews with law enforcement officers, she identified defendant in the third interview only because she was confronted with her involvement in Padilla's theft of Herrera's drugs, and she testified after being granted immunity for the drug theft. Defendant argues Ochoa similarly lacked credibility because he testified under a grant of immunity, he was

a paid informant, and he provided information about Padilla after being arrested in another case.

Hernandez readily admitted her involvement in running drugs for Herrera and she received immunity for being involved in Padilla's theft of Herrera's drugs. Hernandez did not receive immunity because she faced perjury charges in this case. As for Ochoa, his description of defendant's conduct and statements in the hours immediately after the murder, when he asked Ochoa to get rid of the shell casings and made certain statements that night, were corroborated by Valencia. More importantly, there was no other evidence introduced at either the preliminary hearing or the partial trial that another person committed the murder.

### D. *Defendant's theories about other possible suspects.*

Defendant argues that in contrast to the record of conviction in *Patton*, the preliminary hearing and partial trial transcripts suggest he was charged under a now-invalid imputed malice theory because he was possibly an accomplice before the murder, based on his confrontation of Padilla, Hernandez, Owens, and Flores at the store and questions about the theft from Herrera; and he was an accomplice after the murder, based on his request for Ochoa to get rid of the bullet casings. Defendant points to trial testimony from Padilla's stepdaughter, that she heard a car screeching away "just seconds later" after the shooting, and argues her testimony was consistent with the presence of a getaway driver, which meant a second person was present and defendant could have been charged as an accomplice before or after the fact.

As set forth above, the stepdaughter's testimony was slightly different. She said that "a few minutes" after she heard the final gunshot, she heard a car "screech" like it was going fast and "in a hurry to leave." On cross-examination, she testified that she heard the car screech about "30 seconds" after she heard the final gunshot. Under either time span, defendant would have had sufficient time to leave the backyard gate, return to a vehicle, and drive away.

Defendant next asserts the preliminary hearing and partial trial transcripts showed there was "a plethora of evidence" that "a number of other people" were either involved in and/or present at the time of the shooting, and the trial court improperly made a factual finding that defendant was the actual killer in the face of contrary evidence about other perpetrators. Defendant suggests Hernandez, Owens, Eddie Herrera, "as well as any and all" of Herrera's other associates may have killed Padilla as an act of loyalty to Herrera. However, there was no evidence that Herrera or an unknown person was seen at or around Padilla's house on the night of the shooting. It was undisputed that Hernandez and Owens were in the backyard at the time of the shooting, and there was no evidence that either of them shot Padilla or were seen with a gun or shell casings before or after the shooting.

Defendant suggests other possible suspects included those who were involved in Padilla's burglary of Herrera's rental house, because they "may have had a motive to come onto [Padilla's] wife's property that evening and, for example, seize a greater portion of the previously stolen loot, includ[ing] Cesar Cruz, the victim's girlfriend [Susan Flores], and a man named John Salcido, given all these individuals were present around the time the loot was initially divided into thirds on the same property." The record again refutes this claim. Hernandez testified Padilla committed the burglary and theft of Herrera's drugs and split up the stolen drugs with Hernandez and Cruz, and/or Salcedo and Flores, before Hernandez and Owens moved into Padilla's basement.

Hernandez testified she moved onto Padilla's property about three weeks before the shooting, and there was no evidence Cruz and/or Salcedo were present on the day of the shooting. As for Flores, Hernandez testified she was with them when they walked to the store and were confronted by defendant, but there was no evidence Flores was still at Padilla's house when he was shot that night.

Defendant also offers the following scenario, albeit "admittedly less plausibl[e]," where members of Padilla's family could have been involved since they were inside the

51.

house when he was shot: Padilla had a girlfriend, he was not living at the house with his wife, he allowed his "criminal associates" Hernandez and Owens to live in the backyard trailer, he conducted "nefarious activities" in the basement by dividing the stolen property with Hernandez and the others, and the "situation was so bad" that Padilla told his stepdaughter not to go into the backyard. Again, this scenario is undermined by the actual evidence—Padilla arrived at the house with food for his family, his wife left for work, his two stepchildren were inside the house at the time of the shooting, and there was no evidence the wife returned from work or the children emerged from their house to shoot Padilla.

As explained by the California Supreme Court, the " 'prima facie bar was intentionally and correctly set very low' " but it is not meaningless. (*Lewis, supra*, 11 Cal.5th at p. 972.) A petitioner "confronting a record of conviction that demonstrates relief is unavailable ha[s] the burden of coming forward with nonconclusory allegations to alert the prosecution and the court to what issues an evidentiary hearing would entail." (*Patton, supra*, 17 Cal.5th at p. 567.) A petitioner may satisfy this burden by pointing to "specific facts that identify someone else as the direct perpetrator." (*Ibid.*) However, a factual dispute does not arise "from mere latent, speculative possibilities; that is, a hypothetical alternate direct perpetrator cannot be conjured from thin air or a legal conclusion." (*Ibid.*)

Defendant's scenarios in his appellate briefing about other possible killers, running the gamut from Herrera to Padilla's stepchildren, lacks any support in the record of conviction and consists of the type of "latent, speculative possibilities" disapproved in *Patton* as being "conjured from thin air." (*Patton, supra,* 17 Cal.5th at p. 567.)

## V. Ineffective Assistance; Defense Counsel's Factual Basis Stipulation at the Plea Hearing.

In both his pre- and post-*Patton* briefing, defendant has raised ineffective assistance arguments based on the conduct of his defense attorney, Mr. Alvarez, when he

stipulated to the factual basis for his plea at the plea hearing.  Defendant argues the trial court could not rely on the factual basis stipulation to find he was the actual killer, defense counsel was prejudicially ineffective for entering into the stipulation, and his attorneys during the section 1172.6 proceedings were prejudicially ineffective for failing to raise defense counsel's alleged ineffectiveness.  In issue VII, *post*, we will address his separate argument that his attorneys during the section 1172.6 proceedings failed to properly represent him because of an alleged conflict with Mr. Alvarez, his trial attorney.

### A.    *Pleas and the factual basis*.

When a defendant enters a plea, the trial court must "garner information regarding the factual basis for the plea from either defendant or defense counsel to comply with section 1192.5.  If the trial court inquires of the defendant regarding the factual basis, the court may develop the factual basis for the plea on the record through its own examination by having the defendant describe the conduct that gave rise to the charge [citation], or question the defendant regarding the factual basis described in the complaint or written plea agreement.  [Citations.]  If the trial court inquires of defense counsel regarding the factual basis, it should request that defense counsel stipulate to a particular document that provides an adequate factual basis, such as a complaint, police report, preliminary hearing transcript, probation report, grand jury transcript, or written plea agreement.  [Citation.]  Under either approach, a bare statement by the judge that a factual basis exists, without the above inquiry, is inadequate." (*People v. Holmes* (2004) 32 Cal.4th 432, 436.)

### B.    *The factual basis stipulation at the plea hearing*.

Defendant's ineffective assistance arguments are based on his plea hearing in 2016, when the parties stipulated to the factual basis for his plea.  As set forth above, the trial court asked the parties for the factual basis for his plea.

53.

"THE COURT:        .... [A]re the People willing to submit as a factual basis the preliminary hearing transcript, as well as the trial transcript up to this point?

"[THE PROSECUTOR]:  Yes, your Honor.  [¶]  And I would just state for the record a brief summary:  That on or about May 25th, 2015, in the County of Madera, the defendant did approach Demetrius Padilla while Demetrius Padilla was in his backyard that evening, *and did shoot Demetrius Padilla deliberately, and with premeditation.*

"THE COURT:        Mr. Alvarez [defense counsel], do you stipulate to that factual basis?

"MR. ALVAREZ:   As well as to the transcripts thus far in the case, yes.

"THE COURT:        Thank you."  (Italics added.)

## C.        *Defendant's arguments about the factual basis stipulation.*

Defendant asserts the People improperly argued in its opposition to his section 1172.6 petition that the trial court could rely on defense counsel's factual basis stipulation at the plea hearing to find he was the actual killer.  Defendant asserts his defense counsel's factual basis stipulation at the plea hearing did not constitute an adoptive admission or a stipulation to every fact raised by the allegations, including that he was the actual killer of Padilla, the advisement and waivers of his constitutional rights for his plea did not address an adoptive admission to being the actual killer, and such a conclusion would be "contrary" to the alleged "immunity" promise he received in the plea agreement as to the firearm enhancements.

Defendant's arguments in his initial briefing were based on pre-*Patton* opinions that held a factual basis stipulation at a plea hearing did not constitute a "'binding admission for all purposes'" to find a petitioner was the actual killer and ineligible for resentencing under section 1172.6.  (See, e.g., *People v. Flores* (2022) 76 Cal.App.5th 974, 990, 992, disapproved in *Patton*, *supra*, 17 Cal.5th at pp. 561, 569.)  As explained above, however, *Patton's* holding that the preliminary hearing transcript is part of the

54.

record of conviction was not conditioned on whether the defendant stipulated to the preliminary hearing transcript as the factual basis for his plea. (*Patton,* at p. 569.)

In any event, regardless of the arguments raised in the People's opposition to defendant's section 1172.6 petition for resentencing, the trial court at prima facie hearing never stated that it found defendant was the actual killer based on defense counsel's factual basis stipulation at defendant's plea hearing in 2016. Instead, as acknowledged by defendant, the court expressly reviewed the preliminary hearing and partial trial transcripts to find defendant was the actual killer and ineligible for resentencing as a matter of law.

### D.  *Defendant's other contentions regarding defense counsel's factual basis stipulation at the plea hearing.*

Despite defendant's concession the trial court did not rely on the factual basis stipulation to find he was the actual killer, he asserts in his post-*Patton* supplemental briefing that the People were still relying on the adoptive admission theory of that stipulation to argue he was the actual killer. Defendant again argues he was not bound by defense counsel's factual basis stipulation at the plea hearing, the stipulation did not constitute an adoptive admission, and his plea did not constitute a knowing, intelligently, and voluntary waiver to make such an admission.

Defendant further argues that in the course of the section 1172.6 proceedings, he could have collaterally challenged the validity of defense counsel's factual basis stipulation at the plea hearing, based on the alleged ineffective assistance of Mr. Alvarez, his defense counsel throughout the trial and plea proceedings, and his attorneys during the section 1172.6 proceedings were prejudicially ineffective for failing to challenge the validity of defense counsel's factual basis stipulation.

In making these arguments, defendant's post-*Patton* briefing cites the People's responsive brief, filed prior to *Patton*, where it argued the trial court correctly denied his section 1172.6 petition based on defense counsel's factual basis stipulation at the plea

hearing. In the People's post-*Patton* supplemental brief, however, the People did not renew the adoptive admission argument, and instead acknowledged defense counsel's factual basis stipulation at the plea hearing was irrelevant to the trial court's reliance on the preliminary hearing and partial trial transcripts to make the prima facie determination that defendant was the actual killer.

Defense counsel's factual basis stipulation at the plea hearing is not relevant to any issues in this case, since *Patton* held such a stipulation was not required to rely on a preliminary hearing transcript to make the prima facie determination, the trial court did not rely on or treat the stipulation as an adoptive admission to deny the section 1172.6 petition, and the court's prima facie finding was independently based on the transcripts.

## VI.    Ineffective Assistance of Counsel During the Section 1172.6 Proceedings.

Defendant argues the attorneys who represented him during the section 1172. 6 proceedings were prejudicially ineffective because they "did not meet the bare minimum required, even pre-*Patton*." Defendant argues the attorney who prepared the reply to the People's opposition to his section 1172.6 petition filed "a completely unresponsive, boilerplate reply brief" that "completely ignored the prosecutor's entire argument" and did not raise defense counsel's alleged ineffective assistance for making the factual basis stipulation at the plea hearing.

Defendant further asserts the attorney who appeared at the prima facie hearing "had no personal knowledge" of his case, he was an "unprepared stand-in," he submitted the matter without addressing the record, he  violated his ethical duty "to have 'carefully' investigated the facts and relevant law," and he violated attorney-client privilege by disclosing confidential communications with defendant to the court.

### A.    *Ineffective assistance*.

"In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he

must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.)

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.… If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

**B.     *Analysis*.**

The record refutes defendant's claims of ineffective assistance during the section 1172.6 proceedings. As set forth above, defendant filed his section 1172.6 petition for resentencing in propria persona, by checking boxes on a preprinted form that alleged he was eligible for resentencing. The People filed opposition and, as explained above, argued the trial court could rely on the factual basis stipulation at the plea hearing to find defendant was the actual killer.

After the *Marsden* hearing and numerous substitution orders, the court appointed the FAC Fresno firm to represent defendant in the section 1172.6 proceedings. Ms. Takao of that firm filed defendant's reply brief to the People's opposition, and correctly argued the trial court could not rely on this court's nonpublished opinion in his direct appeal to make the prima facie determination; this argument was consistent with *Lewis, supra*, 11 Cal.5th at p. 972, and has not been undermined by *Patton*. Ms. Tacao's reply brief also made the argument that was being followed by some appellate courts prior to *Patton*—that the trial court could not rely on the preliminary hearing transcript to make the prima facie determination, defendant's petition was facially valid and stated a

prima facie case for relief even though he used a preprinted form, and an evidentiary hearing was required. (See, e.g., *Patton, supra*, 17 Cal.5th at pp. 561–562.)

As for his representation at the prima facie hearing, Mr. Dunia, who was in the FAC firm, appeared for Ms. Takao. The court asked Mr. Dunia if he was prepared to go forward or whether it was Ms. Takao's case. Mr. Dunia stated Ms. Takao filed the reply brief and it was her case, but she out of town and unable to appear. Mr. Dunia stated he would request a continuance for Ms. Takao to appear if the court had questions about the case, and he was prepared to submit the matter if the court did not have any questions. The prosecutor made the same request if the court had questions.

The trial court reviewed the parties' briefs, said it did not have any questions, stated the question raised a legal issue and, by relying on the preliminary hearing and partial trial transcripts, made the inferential finding that the transcripts were part of the record of conviction. The court reviewed the testimony from those transcripts and made extensive findings that defendant was the actual killer and ineligible for resentencing.

Ms. Takao was not ineffective for filing a reply brief in the section 1172.6 proceedings consistent with *Lewis*'s holding that the trial court could not rely on the nonpublished opinion from defendant's direct appeal, and the position taken by other appellate courts at that time, that the trial court could not rely on the preliminary hearing transcript to make the prima facie determination. Moreover, Mr. Dunia was not ineffective when he appeared at the prima facie hearing and expressly stated he would move for a continuance if the court wanted to hear further arguments on the matter. The prosecutor made the identical request, and the court stated it was prepared to rule on the legal question that it could rely on the transcripts to make the prima facie determination.

Finally, defendant asserts Mr. Dunia was prejudicially effective at the prima facie hearing because he disclosed "to the court and to the prosecutor … confidential attorney-client communications with [defendant], with respect to their dispute over tactics, in apparent breach of the duty of confidentiality."

Defendant's argument is apparently based on an exchange that occurred toward the end of the section 1172.6 hearing, after the court stated it did not have any questions. Mr. Dunia advised the court that he was prepared to submit the matter if it did not have any questions, and further stated defendant "is in disagreement as far as if that is what he would like done." The court asked if he had additional arguments as to whether a prima facie case for relief was established. Mr. Dunia replied he did not have additional arguments, but defendant "wants to present additional new evidence, should the Court find it there—additional new evidence. I explained that that is the second phase. He wants to have that be included in the first phase." The court stated that was not part of the process, because it had to first make the prima facie determination.

Mr. Dunia did not violate the attorney-client privilege during this exchange. Instead, he was trying to explain to defendant the statutory procedures required under section 1172.6, and that the court had to make the prima facie determination before it could consider additional evidence at an evidentiary hearing. This brief explanation did not result in disclosure of any confidential information related to the substantive issues of his case.[19]

## VII. Ineffective Assistance; Right to Conflict-free Counsel.

As already addressed herein, defendant asserts Mr. Alvarez, his defense attorney at the plea hearing, was prejudicially ineffective because he stipulated to the prosecutor's statement that the factual basis for the plea was that defendant shot and killed Padilla, and his factual basis stipulation was prejudicial because it permitted the trial court to rely on it to make the prima facie finding that defendant was the actual killer and ineligible for resentencing under section 1172.6.

---

[19] In issue VIII, *post*, we will address defendant's additional arguments based on his request to introduce additional evidence at the prima facie hearing.

In issue V, *ante*, we rejected this assertion because even though the trial court conducted the prima facie hearing prior to *Patton*, it did not rely on defense counsel's factual basis stipulation at the plea hearing to make the prima facie determination or even as the basis to rely on the preliminary hearing and partial trial transcripts. Instead, the court made lengthy findings after independently reviewing the transcripts that defendant was the only person identified as the actual killer and ineligible for resentencing pursuant to section 1172.6.

Defendant argues he did not receive conflict-free representation from the attorneys who were appointed to represent him in the section 1172.6 proceedings because they were members of the FAC firm. Defendant asserts his attorneys would have been reluctant to argue that Mr. Alvarez, the partner in the FAC firm, was prejudicially ineffective when he entered the factual basis stipulation at his plea hearing. He further asserts the FAC attorneys could have raised Mr. Alvarez's alleged ineffectiveness in the course of the section 1172.6 proceedings to argue the trial court could not rely on the factual basis stipulation to find he was the actual killer at the prima facie hearing.

Defendant claims his attorneys failed to raise Mr. Alvarez's alleged ineffective assistance because of their purported conflict since he was a partner in their firm. Defendant concludes their failure to raise these issues because of this alleged conflict was prejudicial because these arguments had merit and would have prevented the trial court from relying on the factual basis stipulation to find he was the actual killer and ineligible for resentencing.

We have already found that defense counsel's factual basis stipulation was not relevant to the issues herein. Given the importance of defendant's constitutional claims, however, we will address his conflict contentions.

### A. *Conflict-free counsel.*

The constitutional right to counsel "includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client.

[Citations.] 'It has long been held that under both [federal and state] Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant.' [Citation.] 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests." ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).)

"If a conflict of interest impedes defense counsel from asserting his client's contentions without fear of consequences to himself or herself, the integrity of the adversary system is cast into doubt because counsel cannot 'play[] the role necessary to ensure that the trial is fair.' " (*Harris v. Superior Court* (2014) 225 Cal.App.4th 1129, 1137–1138; *Strickland v. Washington, supra,* 466 U.S. at p. 685.

"[C]laims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that, under *Strickland …* generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different. [Citation.] In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest '*that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.' [Citations.] '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.' [Citation.] 'An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.' " (*Doolin*, *supra*, 45 Cal.4th at pp. 417–418.)

"[A] determination of whether counsel's performance was 'adversely affected' under the federal standard 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had

there been no conflict.  [Citation.]  In undertaking such an inquiry, we are … bound by the record.  But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission.  We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' " (*Doolin*, *supra*, 45 Cal.4th at p. 418, italics omitted in original.)

"A conflict of interest may arise from an attorney's concurrent or successive representation of clients with adverse interests." (*People v. Baylis* (2006) 139 Cal.App.4th 1054, 1064.)  Concurrent representation occurs "where an attorney seeks to represent in a single matter multiple clients with … adverse interests in separate matters." (*Id*. at p. 1065, fn. omitted.)  A conflict may also arise "out of the successive representation of a former and a current client," (*id*. at p. 1066) where there was a "substantial relationship between the former representation and the current representation" (*ibid*.).  "A substantial relationship is said to exist when it appears, by virtue of the nature of the former representation or the relationship of the attorney to his former client, that confidential information material to the current representation 'would normally have been imparted to the attorney.' " (*Ibid*.)

Except in a concurrent representation case where an actual conflict arises from dual representation, there is no presumption of prejudice in the posttrial conflict of interest context.  (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 309; *Doolin*, *supra*, 45 Cal.4th at p. 420; *People v. Ramirez* (2006) 39 Cal.4th 398, 427–428.)  Where there is no presumption of prejudice, "a defendant is required to show that counsel performed deficiently and a reasonable probability exists that, but for counsel's deficiencies, the result of the proceeding would have been different." (*People v. Gonzales and Soliz*, at pp. 309–310; *Doolin*, at p. 421.)

"Hence, to obtain reversal of a criminal verdict, the defendant must demonstrate that (1) counsel labored under an actual conflict of interest that adversely affected counsel's performance, and (2) absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009–1010.)

A reviewing court defers to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a " ' " ' "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 86.)

## B. *Defendant's conflict of interest argument.*

Defendant's conflict of interest argument is based on the following circumstances.

(1)     In 2015, Mr. Alvarez was appointed as conflict counsel to represent defendant in his murder trial after the public defender's office declared a conflict. At that time, Mr. Alvarez was with Richard Ciummo and Associates in Fresno. Mr. Alvarez represented defendant throughout the entirety of the pretrial, trial, plea, and sentencing proceedings.

(2)     During the pretrial proceedings in defendant's murder trial, the prosecutor advised the trial court that Cesar Cruz and Jose Ochoa were going to be witnesses and would be provided with immunity agreements. The court appointed Ciummo and Associates, Madera office, to represent Cruz. The court determined Ochoa was already represented by Ms. Reed of the Ciummo firm. The court stated the Fresno and Madera offices of the Ciummo firm were separate entities.[20]

---

[20]     Ochoa testified at the trial, as set forth above. Defendant states Cruz did not testify at his jury trial. However, Cruz was on the prosecution's witness list and the prosecution was still presenting its case when defendant pleaded guilty.

(3)     Mr. Alvarez entered into the factual basis stipulation at defendant's plea hearing, as set forth above.

(4)     During the section 1172.6 proceedings, the court initially appointed the public defender's office to represent defendant; then relieved the public defender and appointed the Madera Alternate Defense office, which reported a conflict; and then appointed "wheel" attorney Cris Perez, who was not a member of the Ciummo firm.

(5)     The trial court conducted a *Marsden* hearing as defendant's motion to discharge Mr. Perez.  During that hearing, defendant complained Mr. Perez refused to argue Mr. Alvarez was prejudicially ineffective at his plea hearing.  Mr. Perez stated he was a friend of Mr. Alvarez, and he did not feel comfortable arguing he was ineffective.  The court found a conflict and relieved Mr. Perez.

(6)     The court next appointed Alexander Martin, who was later relieved for unrelated reasons.

(7)     On September 29, 2023, the court appointed the FAC Fresno firm to represent defendant in the section 1172.6 proceedings.

(8)     On October 5, 2023, Mr. Dunia from the FAC Fresno firm appeared with defendant, and requested a continuance because he did not have a definite answer as to whether his firm had a conflict.

(9)      On October 10, 2023, Ms. Takao of FAC Fresno filed defendant's reply brief in support of his section 1172.6 petition.

(10)    On October 12, 2023, at the section 1172.6 prima facie hearing, Mr. Dunia appeared with defendant and stated his "secretaries had double-checked. There is no conflict."

Defendant next cites sources from the Internet, that "Mr. Alvarez later became a named partner of Ciummo & Associates, in 2020, and that firm was renamed Fitzgerald,

64.

Alvarez & Ciummo. (See Fitzgerald, Alvarez & Ciummo, https://faclawoffices.com/about/[last visted May 16, 2024].) He is currently the chief defense attorney of the Fresno branch. (*Ibid*.)"

Defendant further cites the Internet and states: "The Law Office of Fitzgerald, Alvarez & Ciummo's website notes that attorney Richard Ciummo joined the original firm in 1988. In 2016, Mr. Fitzgerald acquired all of Mr. Ciummo's remaining stock in the firm and was promoted to CEO. In 2020, Antonio Alvarez became shareholder, vice-president, and Chief Defense Attorney of the Fresno branch, and the firm was renamed to 'Fitzgerald, Alvarez & Ciummo.' (Fitzgerald, Alvarez & Ciummo, About, https://faclawoffices.com/about/ [last visited May 16, 2024]; see also The State Bar of California, Attorney Search 'Antonio Alvarez' at https://apps.calbar.ca.gov/ attorney/LicenseeSearch/QuickSearch?FreeText=Antonio+Alvarez+&SoundsLike=false [last visited May 17, 2024] [indicating only one Antonio Alvarez was barred in California during the relevant time frame].)"

Defendant's conflict claim is based on this procedural background from the appellate record, along with information outside the record that appellate counsel apparently obtained from the Internet. In his pre-*Patton* appellate briefing, defendant argued the attorneys who represented him during the section 1172.6 proceedings failed to raise Mr. Alvarez's alleged ineffective assistance at his plea hearing because he was a partner in their firm. Defendant asserted this alleged conflict prevented his attorneys from objecting to the People's argument that the trial court could rely on the factual basis stipulation to make the prima facie finding, and any attorney in the FAC firm had a direct conflict of interest that prevented them from raising the alleged ineffective of his trial counsel.

Defendant renews this argument in his post-*Patton* supplemental briefing and asserts: "[T]he very firm [defendant's] petition required him to challenge was re-appointed for him, which was also the same firm who represented two witnesses against

65.

him at trial," the same firm filed "a mere boilerplate reply" for the prima facie hearing, the FAC attorney who appeared at the prima facie hearing "conceded he had no 'particular' knowledge" of defendant's case, and defendant "attempted to personally interject, to add evidence and allegations in his support."

### C. *Analysis*.

We note that defendant's arguments are partially based on circumstances that are outside the record of this appeal, particularly the history of Mr. Alvarez with the Ciummo and FAC firms and would have been more appropriate in a habeas petition. (See, e.g., *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

In any event, we have already addressed and rejected defendant's underlying arguments about the factual basis stipulation at his plea hearing. While the People argued in the section 1172.6 proceedings that the trial court could rely on the factual basis stipulation to make the prima facie determination, the record herein clearly shows the trial court declined to agree with the People, and it did not rely on the stipulation to make the prima facie finding or as the reason that it could review the preliminary hearing and partial trial transcripts to find defendant was the actual killer.

In making his conflict arguments, defendant cites the discussion at the confidential *Marsden* hearing when he sought to discharge Mr. Perez, who was appointed as conflict counsel and was not part of the Ciummo or FAC firms. Mr. Perez stated defendant wanted to argue Mr. Alvarez was ineffective at the plea hearing, but Mr. Perez did not feel comfortable making that argument since he considered Mr. Alvarez to be a friend. Defendant suggests his FAC attorneys suffered from the same conflict. In addition to the irrelevance of the factual basis stipulation, Mr. Perez stated his own personal conflict as a friend of Mr. Alvarez, and not as a member of the same firm.

In order to obtain reversal of a conviction based on counsel's alleged conflict, the defendant must demonstrate that "absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different."

66.

(*People v. Mai, supra,* 57 Cal.4th at p. 1010.) Even assuming, without deciding, defendant's attorneys from the FAC firm during the section 1172.6 proceedings were subject to any type of conflict, there was no prejudice. The trial court never relied on the factual basis stipulation to make the prima facie determination and Mr. Alvarez's representation of defendant is not at issue. More importantly, *Patton* expressly rejected that a factual basis stipulation was required for a court to rely on a preliminary hearing transcript to make the section 1172.6 prima facie determination.[21]

## VIII. Remand is appropriate pursuant to Patton.

Defendant raises two additional issues: the trial court erroneously "silenced" him when it refused to let him speak at the prima facie hearing; and the matter must be remanded for defendant to file a supplemental petition consistent with the holding in *Patton*.

As discussed in issue VII, *ante*, defendant attempted to address the court at the prim facie hearing, and it is not clear if he wanted to make additional arguments and/or introduce evidence. Both his attorney and the trial court correctly advised him that section 1172.6 did not permit the introduction of new evidence at the prima facie hearing, and that additional evidence would have been admissible at the evidentiary hearing. The trial court did not commit err by failing to anticipate *Patton*'s holding that a petitioner can point to specific facts to refute the preliminary hearing transcript.

---

[21] We note that in *Rhaburn v. Superior Court* (2006) 140 Cal.App.4th 1566, 1571–1782, the court rejected the rigid presumption of vicarious disqualification in successive representations with adverse interests in the criminal law context for public entities such as the public defender's office. *Rhaburn* held that in considering a motion to disqualify counsel related to confidential information presumably disclosed to counsel by a former client, "the trial court should evaluate the totality of the circumstances in determining whether there is a reasonable possibility that the individual attorney representing defendant either *has* obtained confidential information about the [former client] collected by his or her office, *or* may inadvertently acquire such information through file review, office conversation, or otherwise." (*Id.* at p. 1581; see also *Cain v. Superior Court* (2025) 110 Cal.App.5th 639, 649.)

On that point, defendant requests remand of this matter to the trial court so he can file a supplemental petition consistent with *Patton*'s holding. As defendant correctly argues, *Patton* has clarified the preliminary hearing transcript is part of the record of conviction for purposes of the prima facie determination, and that at the prima facie hearing, "[a] dispute regarding the basis of a conviction might arise if, for instance, a petitioner points to specific facts that identify someone else as the direct perpetrator. At the least, as the People note …, this may come from the record itself. But absent specific facts, no such dispute arises … from mere latent, speculative possibilities; that is, a hypothetical alternate direct perpetrator cannot be conjured from thin air or a legal conclusion." (*Patton, supra*, 17 Cal.5th at p. 567.)

*Patton* further held a petitioner has multiple opportunities to proffer specific facts to raise such a dispute because "the initial petition itself, which is not limited to the allegations found on preprinted forms, begins, but does not end, the inquiry. Section 1172.6, subdivision (c) expressly anticipates a petitioner's reply to the People's response and, '[a]fter the parties have had an opportunity to submit briefings,' arguments at a hearing." (*Patton, supra*, 17 Cal.5th at p. 567.) The trial courts should "implement section 1172.6 so that petitioners have 'meaningful' opportunities to present their petitions. [Citations.] Nothing in subdivision (c), for instance, has dissuaded courts from, as appropriate, permitting a substitute petition for resentencing after appointment of counsel." (*Id*. at p. 568.)

*Patton* held the trial court's prima facie finding as to the defendant's petition in that case was not erroneous, but it granted the defendant's request "to be permitted to plead additional facts on remand" and, "out of an abundance of caution," ordered remand to the trial court "with directions for that court to consider an amended petition should [the defendant] within 30 days of that remand, seek to file one." (*Patton*, *supra*, 17 Cal.5th at pp. 569–570.)

68.

As in *Patton*, we find that the trial court's reliance on the preliminary hearing and partial trial transcripts to make the prima facie finding that defendant was the actual killer was not erroneous.

Also as in *Patton*, we grant defendant's request, "out of an abundance of caution," to remand the matter to permit him file a supplemental petition to plead "additional facts on remand," since he did not have the benefit of *Patton*'s guidance during the prima facie proceedings. (*Patton, supra*, 17 Cal.5th at pp. 569–570; *People v. Glass, supra,* 110 Cal.App.5th at p. 925.)

## DISPOSITION

The matter is remanded to the trial court with directions for that court to consider an amended petition should defendant, within 30 days of that remand, seek to file one. (*Patton, supra*, 17 Cal.5th at p. 570.) We otherwise affirm the trial court's order of October 12, 2023.


LEVY, Acting P. J.

WE CONCUR:


MEEHAN, J.


DE SANTOS, J.